**GENERAL LEASEWAYS, INC.,**
**Plaintiff-Appellant,**

v.

**NATIONAL TRUCK LEASING ASSOCI-ATION, d/b/a National Truck Leasing System, et al., Defendants-Appellees.**

No. 86–2832.

United States Court of Appeals,
Seventh Circuit.

Argued May 21, 1987.

Decided Sept. 18, 1987.

Rehearing and Rehearing En Banc Denied Oct. 20, 1987.

Jeffery M. Cross, Ross & Hardies, Chicago, Ill., for plaintiff-appellant.

Kevin M. Forde, Kevin M. Forde, Ltd., Chicago, Ill., for defendants-appellees.

Before COFFEY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

In 1983, General Leaseways, Inc. filed suit against National Truck Leasing Association alleging violations of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The district court granted General Leaseways' motion for a preliminary injunction, and this court affirmed on appeal. *General Leaseways, Inc. v. National Truck Leasing Ass'n,* 744 F.2d 588 (7th Cir.1984). The injunction was subsequently made permanent. General Leaseways' damage claims were tried to a jury, which returned a special verdict finding that General Leaseways "bore substantially equal responsibility" for the antitrust violations. The jury further found that General Leaseways was injured by those violations, but assessed damages in the amount of "zero" dollars. General Leaseways appeals. For the reasons set forth below, we affirm.

## I

The facts concerning the underlying antitrust violations are thoroughly set forth in this court's opinion in the appeal from the preliminary injunction, 744 F.2d at 589–90, and need only be summarized here. National Truck Leasing Association ("the Association") is an affiliation of lessors of trucks. Association members lease trucks on a "full service" basis, which means that they, as opposed to their customers, are responsible for maintenance and repair. When trucks are rented for "over-the-road" use, *i.e.* for longer hauls outside the vicinity of the lessor, other Association members furnish these services on a reciprocal basis. This arrangement essentially provides Association members with a national network of service centers and enables them to compete with other national full-service truck leasing enterprises, such as Hertz or Avis. General Leaseways has been a member of the Association since 1972.

Among the rules of the Association were several restrictions on the extent to which Association members could compete with one another. No member was allowed to operate an Association franchise within the territory of another member, or to use the Association name or trademarks in operating a non-franchised business within another member's territory. Furthermore, an Association policy voided reciprocal service privileges for any member's trucks that were leased by a customer located outside of that member's territory. A fourth rule prohibited any Association member from operating a franchise of any other full-service truck leasing system.

In 1981 and 1982 General Leaseways acquired several Hertz and Avis truck rental facilities. General Leaseways sought to convert the Avis facilities to Association franchises, even though some of those facilities were in areas already served by Association members. The Association received complaints from other members in the cities where General Leaseways proposed to establish its newly-acquired Avis locations as Association franchises, and from an Association member in Des Moines, Iowa, site of a Hertz facility that General Leaseways had acquired. Acting under the authority of the territorial restrictions described above, the Association suspended General Leaseways' reciprocal service privileges. General Leaseways thereupon filed suit to block the suspension.

In the first appeal, this court held that General Leaseways' likelihood of prevailing on its unlawful market allocation claims, under both *"per se"* and "rule of reason" analyses, was sufficient to justify the entry of a preliminary injunction blocking enforcement of the restraints summarized above. 744 F.2d at 595–97. After this court's opinion issued, counsel for the Association conceded in the district court that he had no further evidence to present with regard to the legality of the restraints. The district judge made the injunction permanent. The judge thereafter granted General Leaseways' motion for partial summary judgment on the violation issue.[1]

---

1. The district court denied summary judgment

as to the liability of several individuals who

The illegal nature of the restraints is not contested in this appeal.

The issue of damages was tried to a jury over the course of almost two months in late 1985. General Leaseways sought damages for the calendar years 1983 and 1984, the period between the Association's initial suspension of reciprocal services and the entry of the preliminary injunction. As evidence of injury, General Leaseways offered the testimony of an expert witness who had prepared a study that purported to project the amount of profits General Leaseways had lost because of the territorial restrictions. The Association challenged General Leaseways' proof of economic injury. It also argued, as an affirmative defense, that General Leaseways, as a longtime and active Association member, bore equal responsibility for the maintenance of the illegal system of restrictions and therefore should have been barred from recovery. The district court instructed the jury on the evaluation of General Leaseways' damage study; it also delivered an instruction on the Association's fault-based defense.

Before retiring to deliberate, the jury was given three separate verdict forms,[2] as well as a special interrogatory form that contained, *inter alia,* the following questions and directions:

1. Do you find from a preponderance of the evidence that the plaintiff bore substantially equal responsibility for creating and maintaining the unlawful contract, combination or conspiracy found to exist by this Court and that the plaintiff was not forced by economic pressure to so participate in the contract, combination or conspiracy. Answer "YES" or "NO."

. . . .

4. Do you find from a prepondereance of the evidence that the contract, combination or conspiracy to allocate markets among association members caused injury to General Leaseways' business or property? Answer "YES" or "NO."

. . . .

If you have answered interrogatory No. 4 "yes," answer interrogatory No. 5. If you have answered interrogatory No. 4 "no," you need not answer interrogatory No. 5.

5. What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate plaintiff for the damages, if any, you find the plaintiff has incurred?

After less than two full days of deliberation,[3] the jury returned its verdict, answering "yes" to both questions 1 and 4, and answering "zero 0.00" to question 5. The jury also completed a verdict form, finding for General Leaseways and against the Association, but assessing damages in the amount of "zero."

The issues raised on appeal fall into three analytical categories. General Leaseways first argues that the district court erred in denying its motion for a directed verdict on the Association's contention that General Leaseways bore equal responsibility for the unlawful restrictions, and that the instruction given on that fault-based defense was deficient. Second, General Leaseways challenges an instruction given by the district court, apparently through inadvertence, that discussed the relationship between assumptions and conclusions in General Leaseways' damage study. Finally General Leaseways' claims that the timing and content of supplemental instruc-

purportedly acted on behalf of Association members, finding that the question of their involvement raised disputed factual issues. In the subsequent trial the jury found that none of the individual defendants were liable. General Leaseways has not appealed from those findings.

2. The verdict forms allowed the jury to find for the plaintiff and against all defendants, for all

defendants, or for the plaintiff against some defendant(s) and for other defendant(s) and against the plaintiff.

3. The circumstances surrounding these deliberations, as well as the content and delivery of the damage study and fault defense instructions, will be set forth fully in subsequent sections of this opinion.

tions and comments directed to the jury after deliberations had commenced resulted in a coerced and legally improper verdict.

## II

General Leaseways argues that the Association failed to present "more than a scintilla" of evidence of General Leaseways' responsibility for maintenance of the illegal territorial restriction scheme. The Association describes the evidence of General Leaseways' fault as "overwhelming." In the alternative, General Leaseways argues that the jury instruction on the fault-based defense was defective because it did not include an additional sentence that General Leaseways had submitted.

### A.

The fault-based defense raised by the Association is a variant of the common-law doctrine of *"in pari delicto,"* which literally means "in equal fault." Strictly speaking, the common-law form of the defense [4] is not available to defendants in antitrust lawsuits. *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). In *Perma Life,* the Supreme Court held that the availability of a broadly-applied defense, based on the involvement of antitrust plaintiffs in "some of the same sort of wrongdoing" as the defendants, would undermine the public interest in assuring the continual threat of private action as a deterrent to antitrust violations. 392 U.S. at 138–39, 88 S.Ct. at 1984. The *Perma Life* Court specifically declined to discuss the level of voluntary participation in unlawful conduct that *would* bar a plaintiff's

recovery, because it found that the record before it clearly demonstrated that the plaintiffs' involvement in maintaining the illegal restrictions at issue in that case was the result of economic coercion. *Id.* at 140–41, 88 S.Ct. at 1985–86.[5]

Some differences have arisen among the courts of appeals on the formulation of a fault-based defense standard to be applied in antitrust cases. *Compare Javelin Corp. v. Uniroyal, Inc.,* 546 F.2d 276, 279 (9th Cir.1976) (plaintiff "barred from recovery only when the illegal conspiracy would not have been formed *but for* " its participation) (emphasis added), *cert. denied,* 431 U.S. 938, 97 S.Ct. 2651, 53 L.Ed.2d 256 (1977) *with Columbia Nitrogen Corp. v. Royster Co.,* 451 F.2d 3, 15–16 (4th Cir. 1971) (recovery barred "when parties of substantially equal strength mutually participate in the formulation and execution of the scheme and bear equal responsibility for the consequent restraint of trade"). With the exception of the earlier opinion in this case,[6] this court has not commented on the proper fault standard since stating, in *Premier Elec. Constr. Co. v. Miller-Davis Co.,* 422 F.2d 1132, 1138 (7th Cir.), *cert. denied,* 400 U.S. 828, 91 S.Ct. 56, 27 L.Ed. 2d 58 (1970), that "plaintiffs who do not bear equal responsibility for creating and establishing an illegal scheme ... should not be barred from recovery simply because they are participants."

Most critical to our assessment of the current state of the law on this issue is the Supreme Court's recent decision in *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed. 2d 215 (1985), in which the Supreme Court applied *Perma Life* in the context of a

---

**4.** *See Generally Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306–07, 105 S.Ct. 2622, 2626–27, 86 L.Ed.2d 215 (1985).

**5.** In the present case General Leaseways has not argued that it was coerced into participating in Association activities.

**6.** In its opinion affirming the grant of a preliminary injunction, this court rejected General Leaseways' fault-based defense and noted, "it has been clear that whenever some maxim of equity (such as that to get equitable relief you must have clean hands) collides with the objectives of the antitrust laws, the equity maxim

must give way." *General Leaseways v. National Truck Leasing Ass'n,* 744 F.2d 588, 597 (7th Cir.1984). We need not decide whether the fault-based defense should have the same effect in a damages action as it does in an equitable action. The damages action before us was tried on a different record than the equitable action. As this court noted in the equitable action, "[o]ur conclusions are based on the incomplete record made in the preliminary-injunction proceeding. The full trial may cast the facts in a different light." *Id.* at 597.

private action for damages brought under the federal securities laws. Noting a public interest in vigorous private securities law enforcement, similar to that found in the antitrust area in *Perma Life,* the Court held that the defense of *in pari delicto* in its common-law form would not be available in suits brought under Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5. The Court held that plaintiffs in securities actions (and, by implication, those in antitrust actions as well) [7] would be barred from recovering damages

> on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public.

472 U.S. at 310–11, 105 S.Ct. at 2629.

### B.

General Leaseways argues that the district court erred in denying its motion for a directed verdict in its favor on the issue of whether its own involvement in the anticompetitive restraint scheme barred recovery. In making this argument, General Leaseways bears a difficult burden. As we have frequently observed, the standard under which motions for a directed verdict are judged is very generous to the nonmovant, in this case the Association. *See, e.g., Bergren v. City of Milwaukee,* 811 F.2d 1139, 1142 (7th Cir.1987). The standard to be applied by this court is identical to that applied by the trial court in considering the motion initially. We view the evidence in the light most favorable to the Association. *See Pliska v. City of Stevens Point,* 823 F.2d 1168, 1174 (7th Cir.1987); *Davis v. Lane,* 814 F.2d 397, 402 (7th Cir. 1987); *Bergren,* 811 F.2d at 1141–42. If "the evidence, taken as a whole, provides a sufficient probative basis upon which a jury could reasonably reach a verdict, without 'speculation over legally unfounded claims,'" we shall not disturb the district court's decision. *Webb v. City of Chester,* 813 F.2d 824, 828 (7th Cir.1987) (quoting *Panter v. Marshall Field & Co.,* 646 F.2d 271, 281 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (citation omitted)).

For purposes of this analysis, the competitive restraints at issue may be divided into two categories. The first three restraints prevented *Association members* from competing with one another *as Association members,* by preventing the opening of one member's Association franchise within another's territory (or by allowing refusal of reciprocal service to customers who rented outside their local Association member's territory). These restraints were referred to collectively in this court's injunction opinion as the "location restriction." 744 F.2d at 590. The fourth restraint, referred to as the "nonaffiliation restriction," prevented Association members from joining any *other* organization comparable to (and in competition with) the Association itself, such as Hertz or Avis. The location restrictions had been in place since at least 1972, when General Leaseways was acquired by its current president, Gene Ehlers, and were listed in the franchise agreement Mr. Ehlers signed that year.[8] From September 1976 until September 1978, Mr. Ehlers served on the Association's Board of Directors, the governing body of the Association. The nonaffiliation restriction was adopted in November of 1978, shortly after Mr. Ehlers left the Board.

General Leaseways does not claim that the record lacks evidence of its involvement in the maintenance of the location restriction. Rather, General Leaseways submits that this evidence is irrelevant to its involvement in the fostering of

---

**7.** Because the Court in *Bateman Eichler* expressly relied upon and extended *Perma Life* based on its perception of similar interests in deterrence through private enforcement, *Bateman* must be regarded as authoritative in the antitrust case now before us.

**8.** The rule that reciprocal service could be denied to customers who rented from Association members outside their territory was a "policy" of the Association, rather than a formal rule.

the nonaffiliation restriction, assertedly the restriction whose adoption caused the claimed economic injury. General Leaseways claims that it seeks only damages resulting from the combined operation of both restrictions. We conclude that the two types of restrictions are not so unrelated as to make evidence of support of one irrelevant to the question of support of the other. Viewed in that light, the trial record contains sufficient evidence of General Leaseways' involvement in the entire scheme of restraints on competition among members, both before and after 1978, to allow a reasonable jury to find General Leaseways to be at "substantially equal" fault.

General Leaseways argues that an antitrust plaintiff may not be barred from recovery because of its own involvement in unlawful conduct unless it is the *"precise"* conduct that is the subject of its suit. Appellant's Br. at 15 (emphasis in original). This court, however, has never required such absolute congruence of violations. In applying a fault-based defense we have only required that the plaintiff's misconduct not be "unrelated to the conspiracy and acts pleaded in the complaint," *Pinto Trucking Service, Inc. v. Motor Dispatch, Inc.*, 649 F.2d 530, 534 n. 5 (7th Cir.1981), and we have not found any authority for requiring more.[9] The restraints at issue in the present case are certainly "related" to

one another. The location provision affected the conduct of Association members within the Association by establishing a system of exclusive territorial markets for each member. The nonaffiliation restriction restricted members' activities outside the Association within the rest of the truck leasing business. Both restrictions limit the extent to which members of the Association compete with one another in the full-service truck leasing business. The nonaffiliation restriction is, to a great degree, a symbiotic extension of the location restriction, barring members from circumventing the anticompetitive effects of the latter by joining some other nationwide firm. As complementary provisions, they enabled the Association to restrict competing activity among members throughout the entire full-service truck leasing business. We therefore conclude that evidence of General Leaseways' support and use of the location restriction is relevant to its responsibility for the operation, after 1978, of the two restrictions together.

The record contains a great deal of largely undisputed evidence that General Leaseways approved and supported the location restriction and even pressed for its enforcement against other Association members on occasion. Gene Ehlers himself testified that he had supported the "one franchise per city" system, tr. at 250,[10] and that he

---

9. *Regents of the Univ. of California v. American Broadcasting Co.*, 747 F.2d 511, 519 (9th Cir. 1984) does not support General Leaseways' position. In that case the court held that plaintiffs' involvement in a "nearly identical" (according to Appellant's Br. at 16) contract with other parties would not bar them from recovering from defendant. That case is easily distinguished from the one before us, in which the assertedly "different" restraint simply advanced the same anticompetitive purpose for and against the same actors in a technically different manner.

10. Mr. Ehlers testified that his own idealized concept of a business position did not include competition:

Q. You are a businessman, you have feelings as a businessman, you told us yesterday. How do you feel about competition?
A. Well, I think if you are speaking generally, for competition, the last time I was on top of the Sears Tower, I thought boy, I would really like to have the right to sell lightbulbs

to this city and be the only one there. As a businessman, boy I would like that. That would be some deal.
Q. So you don't like competition?
A. That is not what I said. I said, if you could theoretically get a cartel, if you could be the oil people and regulate prices or if you could have that franchise to sell lightbulbs to the City of Chicago, and you can stand on the Sears Tower every night and say, boy, this is just mine. I think I would like that, yes. Tr. at 248. At the preliminary injunction hearing in November 1983, Mr. Ehlers testified as follows:
Very honestly, if you have two people in the market that are offering practically the same service, it has to impact on the pricing structure in that marketplace, and we much prefer not to have that competition.
*Transcript of Preliminary Injunction Hearing,* November 18, 1983, at 66. At the jury trial, Mr. Ehlers indicated that he stood by that statement. Tr. at 249.

had initiated a complaint to the Association when another member attempted to operate an Association franchise in competition with one of his own in the Waterloo, Iowa area. Tr. at 250–52, 391–96. In March 1978, at a meeting of the Association Board of Directors (of which he was then a member), Mr. Ehlers voted *against* a lifting of the ban on multiple Association franchises in larger cities; in September of that year, just before he left the Board, the lifting of the ban was put on hold by the Board. Mr. Ehlers could not recall whether he voted "yes" or abstained, but no board member voted against the hold, which essentially allowed the multiple franchise ban to remain in place. Tr. at 299–302.[11]

The trial record contains other evidence from which the jury could conclude that General Leaseways supported restrictions on competition among Association members, even after the nonaffiliation restriction was adopted in 1978. The nonaffiliation rule, adopted by the Association's Board of Directors in November 1978 (after Gene Ehlers had left the Board), was discussed at Board meetings prior to that time and was reaffirmed, along with all of the other actions of the Board of Directors taken in 1978, at the Board of Governors' annual meeting in September of 1979. Attendance records show that Gene Ehlers, still a Governor of the Association, was present at the meeting. Although there was no evidence of his vocal participation, the jury could reasonably infer from his presence and his apparent silence that Mr. Ehlers did not object to the reaffirmation of the nonaffiliation rule. Further, although Mr. Ehlers claimed to have complained to the Association about the nonaffiliation rule, the jury could have found that he first sought and obtained exemptions from the rule and first complained about its existence only after an exemption was denied for one of General Leaseways' other operations. The jury heard testimony, including that of Gene Ehlers, that Mr. Ehlers' first reaction to the adoption of the nonaffiliation rule in 1978 was to seek ex-

ceptions from the rule for several Avis franchises already held by General Leaseways, tr. at 157–60, 227–29, 1433, 2089, and that he made no formal complaint about the rule to the Association until November 1982, shortly before this lawsuit was filed, tr. at 484. From these efforts, the jury could reasonably have concluded that Mr. Ehlers opposed the nonaffiliation rule only when *he* was restrained by it.

The record also contains evidence that Gene Ehlers continued to support a system of anticompetitive restrictions even *after* this court affirmed the preliminary injunction that General Leaseways had obtained. Considered in combination with the evidence set forth above, this evidence would support a reasonable conclusion that General Leaseways continually and positively supported the restriction of competition among Association members, and that its support of that goal and of a system of rules that effectuated it continued well into the period for which General Leaseways sought damages.

■ The jury heard testimony from Frank Boyd, former President of the Association, about a telephone call he received from Gene Ehlers late in 1984, shortly after an emergency meeting was held to allow the Board of Directors to rescind the location and nonaffiliation restrictions pursuant to the injunction and this court's decision. Mr. Boyd testified that Mr. Ehlers called him and attempted to stay the Board's hand:

> And with that—when that got out to the members, I got a phone call then from Gene Ehlers. And Gene said "Frank, what have you all done?"
>
> And I said, "What do you mean, what have we done?"
>
> "All these changes you have just made." He said, "You didn't have to do it."
>
> And I said, "What do you mean we didn't have to do it? The Courts have

---

11. Mr. Ehlers claimed that he had voted against lifting the ban on multiple franchises in large cities in order to attempt to force the board to

consider the Association's entire policy with regard to multi-franchise cities, but the jury was entitled to infer otherwise.

told us we have to do it. That's what the whole trial was about."

"Oh," he said, "You have got it wrong. That's not what you had to do. You didn't have to do all of that." He said, "Frank, there is ways we can do this." And he says, "I know we can do it and we can get this done. And it can be legal, and we can keep all of the restraints that you just have thrown out. Don't do it."

Tr. at 1581–82. Mr. Boyd further testified that Mr. Ehlers offered to have his attorneys draw up a plan to restructure the Association in a manner that would allow some restraints to be lawfully maintained, and indicated that Mr. Ehlers was willing to accept shares of Association stock as compensation for his restructuring efforts. Tr. at 1583. According to Mr. Boyd, Mr. Ehlers assured him that his plan would allow retention of exclusive territories for Mr. Ehlers, Mr. Boyd and "all the rest." Tr. at 1585–86. At trial the district court reminded the jury, at General Leaseways' request, that Mr. Ehlers' proposal had called for a *lawful* restructuring of the Association.[12]

While it is undisputed that General Leaseways did violate the restrictions on several occasions, the jury could have found that it did so only after seeking exemptions for itself and that it remained committed to avoiding competition from fellow Association members. The jury did not have to conclude that Mr. Ehlers' attempts to avoid the restraints amounted to abandonment of, or opposition to, whatever benefits he could still derive from them. The jury could also reasonably have concluded, based on Mr. Ehlers' call to Mr. Boyd, that Mr. Ehlers continued to support the principle of reduced competition among Association members after winning the injunction appeal, even though he expressed a personal desire to pursue that objective within the law. We therefore conclude that the jury acted reasonably, upon consideration of the record as a whole, in concluding that General Leaseways bore substantially equal responsibility for the anticompetitive restrictions and that their finding to that effect is sufficiently supported. Accordingly, we find no error in the district court's denial of General Leaseways' motion for a directed verdict on the fault-based defense issue.

## C.

General Leaseways also argues that the district court erroneously instructed the jury on the Association's fault-based defense. The instruction given was as follows:

Even if you find that the plaintiff has proved the member defendants knowingly and intentionally participated in the unlawful contract, the defendants contend that the plaintiff's claim is barred by what the lawyers call an affirmative defense. That affirmative defense, which I have mentioned before and now will discuss in a little more detail, is that the defendants affirmatively contend

---

12. General Leaseways also objected to the admission of this conversation as violative of Fed. R.Evid. 408, which bars admission of evidence of a settlement proposal if offered "to prove liability for or invalidity of [a] claim or its amount." Ruling on a motion *in limine,* the district court did prohibit admission of evidence of a letter Mr. Ehlers sent Mr. Boyd after their telephone conversation, in which Mr. Ehlers explicitly offered to settle his lawsuit as part of an agreement on restructuring the Association. The district court concluded that the suggestions made by Mr. Ehlers in the telephone call were not made in the context of a settlement of this lawsuit, even though the *subsequent* "settlement letter" did refer back to the call. Viewing the whole conversation in context, we agree with the district court's conclusion that the call was not barred by Rule 408.

Apparently arguing in the alternative, General Leaseways also asserts that evidence of the telephone conversation, even if otherwise admissible, should have been excluded under Fed.R. Evid. 403, because of potential prejudicial effect. To the extent that this argument refers to prejudice that might arise from an inference that Mr. Ehlers meant to pursue anything illegal, that possibility was guarded against by the district court's cautionary instruction, which was approved by General Leaseways' counsel. The only other claim of prejudice arises from use of the conversation to support the Association's fault-based defense. This argument confuses prejudice with relevance. Having concluded that the admission of the telephone call did not violate Rule 408, we are unable to discern any manner in which General Leaseways' case was *unfairly* harmed by that evidence.

that the plaintiff bore a substantially equal responsibility for creating and maintaining the unlawful contract which I have found to exist. And that the plaintiff was not coerced by economic pressure into so participating in this combination, but joined it voluntarily and participated in it voluntarily. The plaintiff denies defendants' affirmative defense and says to the extent that he was involved at all, if he was, in the actions of [the Association], he was in there by force of economic pressure.

In order to prevail on this contention, this affirmative defense, the defendants have the burden of proving by a preponderance of the evidence that the plaintiff bears substantially equal responsibility for creating and maintaining the illegal restraints, and that he was not forced by economic pressure to do so.

Tr. at 4437–38.

General Leaseways does not object to anything included in the instruction, but rather to something that the district court left out. When the instruction was offered by the Association, General Leaseways requested the addition of a sentence, substantially derived from language in this court's opinion in *Premier Elec.*, that would have told the jury that "[d]efendants cannot establish their burden of proof simply by proving plaintiff participated in the contract, combination or conspiracy." Tr. at 4195–96; *see Premier Elec.*, 422 F.2d at 1138 ("Plaintiffs who do not bear equal responsibility ... should not be barred from recovery simply because they are participants."). The Association contended that the proposed sentence improperly added to its burden of proof, but the district court twice overruled that objection and indicated that it would give the instruction with the added sentence. However, when the jury was actually instructed, General Leaseways' proposed sentence was accidentally omitted. After the jury retired to begin deliberations, this omission was brought to the court's attention by counsel for General Leaseways, but the judge declined to call the jury back to add the sentence to their charge. Tr. at 4458–59.

In reviewing a claim of error in jury instructions, we will not find reversible error absent some effect on the substantial rights of the parties. Fed.R.Civ.P. 61; *Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 597 (7th Cir.1985). As we have often stated, instructions must be viewed as a whole, both in the context of the other instructions given and in light of the allegations of the complaint, opening and closing arguments and the evidence of record. *Id.*; *Alloy Int'l Co. v. Hoover-NSK Bearing Co.*, 635 F.2d 1222, 1226 (7th Cir.1980). "It is familiar law that we must look to the instructions as a whole, in a common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well." *Wilk v. American Medical Ass'n*, 719 F.2d 207, 218 (7th Cir.1983), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984). We must consider General Leaseways' claim mindful of "the artificiality of assuming that isolated passages in a lengthy set of instructions are apt to spell the difference between victory and defeat." *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 342 (7th Cir.1985).

█ Just as an allegedly erroneous instruction must be viewed in the context of the full charge and other surrounding circumstances, an allegedly erroneous omission of a sentence must also be viewed in context. The instruction actually given by the district court closely tracked the Supreme Court's articulation of the fault standard in *Bateman Eichler*, 472 U.S. at 310–11, 105 S.Ct. at 2628–29 and contained no language objected to by General Leaseways. The omitted sentence merely emphasized the meaning of the "substantially equal responsibility" language by pointing out that mere participation was not enough. Furthermore, General Leaseways' counsel was free to argue to the jury that mere participation was insufficient, and indeed he did so.[13] Perhaps the addi-

---

13. We find no merit in General Leaseways' claim that its counsel's "credibility" was dam-

aged by the district court's failure to instruct the jury on the insufficiency of mere participation

tional sentence proposed by General Leaseways would have made the instruction more precise. Nevertheless, we are satisfied that the instruction as given conveyed the correct message to the jury despite the absence of General Leaseways' proposed addition.

## III

General Leaseways also challenges an instruction that addressed the damage study it offered as evidence of economic injury. The study was performed by Donald J. Pfingstler, a Certified Public Accountant experienced in the field of calculation and projection of economic loss. It projected the "over-the-road" truck rental market share General Leaseways would have achieved in the cities where it had acquired former Avis facilities but had not been permitted to operate them as Association franchises. The study compared market shares obtained in the "Avis acquisition" cities with those obtained by General Leaseways' Association franchises elsewhere.[14] Mr. Pfingstler based his calculations on data obtained in a market share survey performed by General Leaseways' managers in the various cities in question and supervised by Gene Ehlers' son, Michael, a company official.

The district court gave the following instruction regarding the jury's consideration of the Pfingstler study:

> In considering the reasonableness of General Leaseways' damage study, I further instruct you that the calculations in this study depend upon a series of interdependent and interrelated assumptions. These assumptions relate to such matters as projections of revenues and costs, growth in the over-the-road truck leasing industry, past and future competitive conditions and profit margins. You have heard conflicting testimony concerning these and other major assumptions of General Leaseways' study. As to each of these assumptions, it is General Leaseways' burden to establish to your satisfaction that the assumption is reasonable, that it is consistent with your understanding of what would have occurred if the restraints were not enforced, and that it properly accounts for the effects of lawful competition and other factors outside of [the Association's] control. If you find that any one of the assumptions in this study is unreasonable, then you must disregard it and the effect that it has upon the General Leaseways' total damage study. This is because General Leaseways has constructed its study in such a way that we cannot make adjustments of these assumptions by ourselves. There is nothing wrong with this, but this is just the way the damage evidence was presented. But because the assumptions are interdependent, if any assumption is found unreasonable it will have a serious effect on your acceptance on the rest of the damage calculation.

Tr. at 4443–44.[15] In its brief in this court, General Leaseways claims that the "most

in the unlawful restraints. Contrary to counsel's representation, he did not "promise" the jury that they would be so instructed, but instead simply argued the point in the context of the "substantially equal responsibility" test, which was delivered to the jury. Tr. at 4335.

**14.** The Association franchises owned by General Leaseways and included in the damage study comparison group were located in cities where General Leaseways operated as the exclusive Association representative because of the location restriction. The use of these exclusive territories as a benchmark raised the possibility that the damage study would include in its estimate "cartel profits," *i.e.*, profits lost by General Leaseways because it was not allowed to take advantage of the unlawful market allocation restrictions. Based on assurances that the study

was able to exclude such amounts from its estimate, the district court admitted the study into evidence. The jury was instructed that cartel profits were not to be included in any damage award.

**15.** As originally submitted by the Association, the instruction contained language to the effect that, if the jury found any one assumption to be unreasonable, it would have to "disregard" the Pfingstler study "entirely, and give it no weight." The district judge found that language to be an improper comment on the evidence and refused it on two occasions. The text of the instruction found its way accidentally into the court's copy of the jury instructions, and the district judge did not realize he was reading a refused instruction until he was well into it. The language

critical and damaging" part of the instruction is the very last sentence, while at trial its counsel objected only to the part of the instruction that told the jury that it could not by itself make adjustments in the assumptions underlying the damage study's conclusions. Tr. at 4468–69. We find no merit in either contention.

■■■ As we observed in part II.C. of this opinion, the effect of a particular jury instruction must be assessed in light of all the surrounding circumstances, including other instructions, arguments of counsel and evidence of record. We also note that federal trial judges are permitted to comment on or explicate evidence for the benefit of the jury. *Quercia v. United States*, 289 U.S. 466, 469–70, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933); *Garnes v. Gulf & Western Mfg. Co.*, 789 F.2d 637, 643 (8th Cir. 1986); *Citizens State Bank v. Penn Cent. Transp. Co.*, 463 F.2d 611, 614 (7th Cir. 1972); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2557 (1971). As long as the jury is made aware that it is the sole arbiter of factual issues, trial judges are allowed, in the exercise of principled discretion,[16] to comment on or summarize evidence, to "analyze and dissect," *Quercia*, 289 U.S. at 470, 53 S.Ct. at 699, or to "clear away false issues," *Citizens State Bank*, 463 F.2d at 614.

■■■ The damage study instruction challenged by General Leaseways is neither biased nor misleading; it simply reflects certain realities inherent in evaluating evidence of injury through projections like those made in the Pfingstler study. In fact, given the relative complexity of the process by which the study reached its conclusions, we cannot fault the district judge's decision to assist the jury by describing the method by which the study had to be evaluated. The instruction given by the district court was merely a truism, a correct explanation designed to assist the

jury in its assessment of a complex study. Rather than invading the jury's province as fact-finder, the instruction simply pointed the jury to the correct method of evaluation. We therefore find no error in the district court's damage study instruction.

### IV

General Leaseways finally challenges comments made by the district court to the jury after deliberations had begun. It argues that these remarks were improper as a matter of law and resulted in a coerced verdict.

### A.

The jury was instructed on the morning of Thursday, December 19, 1985. During the course of its instructions the district court told the jury several times that the Association had previously been found to have violated the antitrust laws and that the legality of the location and affiliation restrictions was not in issue. The jury was also instructed that, if it found that General Leaseways had failed to prove damages, it was required to return "a verdict for the defendants." Tr. at 4446; *see also* Tr. at 4450 (making the same point during explanation of verdict forms). After a luncheon recess, the jury began its deliberations on the afternoon of the 19th.

After returning to deliberate the next morning (Friday, December 20), the jury submitted the following written question to the trial judge:

> Is it possible to have a verdict for the plaintiff without damages?

After consulting with counsel, the judge delivered the following answer, in open court:

> My answer to that is, broadly, the only issue submitted to you is the question of whether there has been damage; if so,

---

actually read to the jury concerning the effect of a finding that any one assumption was unreasonable was created by the judge as he went along.

**16.** Although the district judge did not originally intend to give the damage study instruction at all, we regard his decision (made in mid-para-

graph) to finish delivering the instruction in modified form to be an exercise of discretion. Accordingly we review the challenged instruction under the abuse-of-discretion standard despite the fact that it would not have been given at all but for an inadvertent act by the judge.

how much, and who is responsible. If, after a consideration of all of the evidence you were to reach the conclusion that no damages had been suffered, then your verdict should be for the defendants.

\* \* \* \* \* \*

You are there to determine whether there are damages or whether there are not damages. If you determine that the plaintiff has suffered damages, then whether some or all of the defendants are responsible for those damages. Finally, if there are damages, how much. If it is your conclusion that there are no damages, then your verdict should be for the defendants.

Tr. at 4512.

After additional deliberations, the jury sent the judge a note later in the day indicating that it was unable to reach a verdict. With the approval of counsel, the judge called the jury into court and delivered an instruction based on that prescribed by this court in *United States v. Silvern*, 484 F.2d 879, 883 (7th Cir.1973) (en banc). The judge also informed the jury, again with the agreement of counsel, that, if they failed to reach a verdict, the case would have to be retried before a new jury. Tr. at 4515–16. Several hours later, in response to a question from the judge, the jury indicated that it was still deadlocked. Tr. at 4517–18. After further consultation with counsel, the judge dismissed the jury for the weekend. At that time, the judge commented that the prospect of a retrial was "distasteful to everybody—including myself...." Tr. at 4527.

On Monday morning, December 23, prior to resumption of deliberations, the Association filed a motion seeking "clarification" of the district court's supplemental instruction in the form of a new instruction to the effect that the jury *could* return a verdict for General Leaseways without awarding damages. After hearing argument on the motion, the district judge called in the jury and addressed them as follows:

I asked you to come back today, and over the weekend and in the discussion this morning with the attorneys I have been reflecting on the fact that during the course of your deliberations on Friday you sent out a question, the gist of which was can you return a verdict for the plaintiff with no damages. And my response, generally, and I don't remember the exact words, was if you find that there are no damages you should return a verdict for the defendant. Upon reflection it occurs to me that while that statement is true it is also true that you can return a verdict for the plaintiff with no damages. So I wanted to correct any misimpression that I might have given you. So that as you address this issue today you can, based upon all of the evidence, find for the plaintiff and assess a damage amount in whatever dollars you feel that the plaintiff has suffered damages. Or you can find for the defendant, purely and simply, and use that verdict form, and that means you don't consider damages. Or you can find for the plaintiff and in your consideration of damages conclude that there are no damages. Those three options are available to you.

Tr. at 4550. The judge also told the jury that they would deliberate no further after that day and that it was "quite possible," although not preferable, for a jury to fail to reach an agreement. Finally, the judge repeated the *Silvern*-type instruction and sent the jury on to further deliberation. Within two hours thereafter [17] the jury returned its verdict and interrogatories, finding General Leaseways to be at substantially equal fault in the maintenance of the unlawful restrictions, finding injury to General Leaseways and awarding "zero" damages.

### B.

■ General Leaseways argues that the district court's supplemental instruction in-

---

**17.** The record does not reflect the length of time the jury deliberated after receiving the final supplemental comments and before returning its verdict. General Leaseways states that it took "less than an hour," Appellant's Br. at 40, while the Association estimates one and one-half hours, Appellee's Br. at 13 n. 7.

forming the jury that it could find for General Leaseways without awarding damages was incorrect as a matter of law. It also argues that this instruction, in combination with the court's comments on the undesirability of retrial, resulted in a coerced verdict. Our review of the record convinces us that, in the circumstances presented here, the supplemental instruction was an evenhanded and appropriate measure designed to help the jury resolve an obvious point of confusion, and that the verdict could not have been influenced improperly by any of the trial court's comments.

1. *The "zero" damage instruction.* In evaluating the decision to give the supplemental instruction, we must remember that the district judge was much closer to the situation than we are. The trial judge, not this appellate panel, was able to sense— and assess—the jury's understanding of the proceedings and its grasp of the technical concepts that had necessarily been included in the jury instructions. Nevertheless, even from the cold record we review, it is quite apparent that the jury was confused about the relationship between injury and damages. The trial judge believed that this confusion stemmed from the repeated mention, throughout the trial, of the finding of antitrust violation on the part of the Association. In his view, this factor seemed to compel the jury to find injury (*i.e.,* "find for the plaintiff") even if it did not accept the proof of damage offered by General Leaseways. Another possible source of confusion was the failure of the special interrogatories to link the injury-damage findings (questions 4 and 5) with the Association's affirmative defense grounded on General Leaseways' share of responsibility for the illegal restrictions (question 1).

■ We agree with General Leaseways that, where a violation of the antitrust laws has already been found, a finding of injury ordinarily necessitates an assessment of some amount in damages.[18] In this case,

however, the presence of the affirmative defense of equal fault created the possibility that no damages would be awarded even if the jury were to find (as it ultimately did) that General Leaseways suffered economic harm as a result of the location and affiliation restrictions. This affirmative defense of equal fault could prevent a monetary recovery whether or not General Leaseways' proof of injury was accepted by the jury. Therefore, the third "alternative" presented to the jury in the district court's supplemental instruction, a verdict for the plaintiff (on the injury issue) without an award of damages, was a legally possible alternative in this case.

Whatever the actual source of the jury's confusion, the district judge apprehended that the jury was unable to follow his earlier instructions regarding the relationship between injury and damages. His supplemental instruction explained their options in a brief and unbiased manner. Although there was more than one way the jury could have arrived at an award of "zero" damages, the court's supplemental instruction did not emphasize any particular theory or result. Indeed, the instruction described the entire range of possible results in neutral terms. The jury was thus permitted either to conclude that the Association had violated the law, but that damages had not been proved, or to accept the Association's affirmative defense as a bar to recovery. Because the district court's supplemental instruction cleared these paths without emphasizing any particular result, we find no error in the decision to deliver it.

2. *Coerced verdict.* General Leaseways finally argues that the district court's comments on the undesirability of retrial, in combination with the "zero" damage instruction, coerced the jury into reaching a compromise verdict. General Leaseways' challenge focuses on two comments made by the judge: his suggestion that he would find a retrial personally "distasteful," and his informing the jury on the morning of

18. Authority cited to the contrary by the Association, Appellees' Br. at 46–47, Tr. at 4532–35, addresses the concept of a finding of *violation* without an award of damages, a point not properly in issue in these proceedings.

December 23 that they were in their last day of deliberation. In evaluating these supplemental comments to the jury, we must consider the challenged remarks in the context of all the instructions that the jury has heard. *United States v. Hamann*, 688 F.2d 507, 511 (7th Cir.1982). The proper inquiry is whether "the court's communications pressured the jury to surrender their honest opinions for the mere purpose of returning a verdict." *United States v. Thibodeaux*, 758 F.2d 199, 203 (7th Cir.1985) (per curiam) (quoting *Hamann*, 688 F.2d at 511).

During deliberations on Friday, December 21, the jury reported a deadlock. With counsels' concurrence, the trial judge gave the instruction prescribed in *United States v. Silvern*, 484 F.2d 879 (7th Cir. 1973), adapted for a civil trial.[19] The prospect of retrial if no verdict was returned was first raised with the jury in reply to their initial indication of deadlock on Friday, December 21, with the approval of counsel for both parties. We do not regard the court's later statement, made as he was dismissing the jury for the weekend and informing them that they were to return on Monday for further deliberations, that a retrial would be "distasteful to everybody—including myself,"[20] to be prejudicial. We note that, upon reconvening on Monday, he specifically advised them, that it was lawfully possible for them to conclude their deliberations without reaching a verdict. We also are confident that no coercive effect resulted from the judge's informing the jurors at that time that they were in their last day of deliberation, especially as this information was conveyed practically in the same breath with his statement that a hung verdict was an acceptable possibility.[21] These prefatory remarks were followed by a second repetition of the *Silvern*-type instructions that had been given on Friday.

General Leaseways argues that another indication of a coerced compromise is the speed with which the jury arrived at its "zero" damage verdict after being told it could do so. It seems far more likely that

19. As is required by *Silvern*, 484 F.2d at 883, this instruction was also given as part of the regular (pre-deliberation) charge. Tr. at 4454; *see United States v. Brown*, 634 F.2d 1069, 1070 (7th Cir.1980) (per curiam).

20. THE COURT: Please be seated, ladies and gentlemen.
   One of the things that we have been trying to do is to not unnecessarily trespass upon your own patience and dedication to the job here. So much time has been invested in this trial, however, and the prospect of retrying it is so distasteful to everybody—including myself, I might add—that we have been struggling for some way to see if a verdict can be reached without unnecessarily pressuring you or interfering with your ability to reach your verdict fairly and considerately.
   The conclusion that I have reached is that I am going to ask you to come back Monday morning and we are going to give you the instructions once again and ask you to try one more time on Monday to see—having had the benefit of the repeated instructions—whether you can reach a verdict, and we won't trespass upon your time after Monday—and let's try one more time.
   So I would like—is it very inconvenient for you when I ask you to come in at 9:00 o'clock —can you all make that—let's try Monday morning at 9:00 o'clock.
   The instructions that I gave were recorded so you won't have to come here and sit. We will give you the tape player and the tape and you can listen to them once again and then make one more effort to reach a verdict.
   Have a pleasant weekend, think about the case but don't discuss it with anyone and we will try again Monday morning at 9:00 o'clock. Thank you and we will see you Monday.
   Tr. at 4527–28.

21. THE COURT: Good morning, ladies and gentlemen.
   Please be seated. We have been together so long we are getting to be old friends.
   I asked you to come back today, and over the weekend and in the discussion this morning with the attorneys I have been reflecting on the fact that during the course of your deliberations on Friday you sent out a question, the gist of which was can you return a verdict for the plaintiff with no damages.

   .     .     .     .     .

   I am going to ask you to work on this case one more day. We won't bring you back after today. It is quite possible for juries to conclude their deliberations without agreeing. It happens in the courthouse and there is nothing wrong with it because the obligation for you to agree is one that you may or may not be able to meet. But we would like a verdict if possible.
   Tr. at 4549–51.

the supplemental instruction allowed, rather than forced, the resulting verdict. In any event, we do not find that the timing of the verdict in relation to the supplemental instruction supports any inference of coercion.

### Conclusion

The trial of this case lasted more than a month and consumed over 4500 pages of transcript. It is not surprising that several unusual circumstances arose during the course of those lengthy proceedings, or that novel legal issues were presented. Our review of the record convinces us that the experienced trial judge, with the help of able and cooperative counsel, correctly evaluated the legal questions presented to him and handled several thorny jury-related problems in an evenhanded and discerning way. Accordingly, the judgment of the district court is affirmed.

AFFIRMED