September 29, 1994

UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

No. 94-1031

WILLIAM H. SULLIVAN II,

Plaintiff - Appellee,

v.

PAUL TAGLIABUE, ET AL.,

Defendants -Appellees.

NATIONAL FOOTBALL LEAGUE, &

MEMBERS OF THE NATIONAL FOOTBALL LEAGUE

Defendants - Appellants.

ERRATA SHEET

The opinion of this Court issued on September 16, 1994, is

amended as follows:

The caption on the coversheet should read: "William H.

Sullivan II, Plaintiff - Appellee v. National Football League, &

Members of the National Football League." "Paul Tagliabue, et

al., Defendants - Appellees" should be deleted.

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1031

WILLIAM H. SULLIVAN II,
Plaintiff - Appellee,

v.

NATIONAL FOOTBALL LEAGUE, &
MEMBERS OF THE NATIONAL FOOTBALL LEAGUE
Defendants - Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

Before

Torruella, Circuit Judge,

Coffin, Senior Circuit Judge,

and Stahl, Circuit Judge.

John Vanderstar, with whom Sonya D. Winner, Ethan M. Posner,

Covington & Burling, Jeremiah T. O'Sullivan, Sarah Chapin

Columbia, Choate, Hall & Stewart, Joseph W. Cotchett, and

Cotchett, Illston & Pitre were on brief for appellants.

Joseph L. Alioto and Frederick P. Furth, with whom Angela M.

Alioto, Law Offices of Joseph L. Alioto, Alan R. Hoffman, Lynch,

Brewer, Hoffman & Sands, Bruce J. Wecker, Michael P. Lehmann and

Furth, Fahrner & Mason, were on brief for appellees.

September 16, 1994

TORRUELLA, Circuit Judge. The National Football League

and twenty-one organizations owning NFL franchises (referred to

collectively as the "NFL") appeal the judgment entered against

them after a jury found that the NFL violated the antitrust laws

by restricting owners of member football clubs from selling

shares in their teams to the public. Plaintiff-appellee, William

H. Sullivan, former owner of the New England Patriots football

team (the "Patriots"), was awarded a total of $51 million in

damages for the losses Sullivan incurred when he had to sell the

Patriots to a private buyer after the NFL prevented him from

offering 49% of the team to the public in the form of publicly

traded stock. Because several prejudicial errors were committed

during the trial, we vacate the judgment and remand for a new

trial.

I. BACKGROUND

Under Article 3.5 of the NFL's constitution and by-

laws, three-quarters of the NFL club owners must approve all

transfers of ownership interests in an NFL team, other than

transfers within a family. In conjunction with this rule is an

uncodified policy against the sale of ownership interests in an

NFL club to the public through offerings of publicly traded

stock. The members, however, retain full authority to approve

any given transfer by a three-quarters vote according to Article

3.5.

Sullivan owned the Patriots from the team's inception

in 1959 until October of 1988. When Sullivan formed the

-2-

Patriots, he and his partner sold non-voting shares of the team

to the public beginning in 1960. At that time, the Patriots were

in the old American Football League ("AFL"), which was separate

from the NFL, and which had no policy against public ownership of

teams. In 1966, the AFL and the old NFL merged into a single

league. Under the terms of the merger, the new NFL would adopt

the old NFL's policy against public ownership. The Patriots,

however, were allowed to retain their level of public ownership

as a special exception to the rule under a grandfather clause.

In 1976, Sullivan sought to acquire the publicly held

shares of the Patriots through a merger of the club into a new

Sullivan-owned company. Stockholders approved the transfer and

the transaction was subsequently consummated, although some

shareholders subsequently brought suit, challenging the

sufficiency of the purchase price. After protracted litigation,

the shareholders obtained a judgment requiring Sullivan to pay

them a higher price for their shares. The Patriots then became a

fully privately owned club.

Sullivan and his son, Chuck Sullivan, who owned the

stadium where the Patriots played, began to experience financial

difficulties and increasing debt burdens in the mid-1980s. The

Sullivans decided that they needed to raise capital to alleviate

their financial problems. After the Boston Celtics professional

basketball franchise made a public offering of 40% of the team in

December of 1986, the Sullivans decided to pursue a similar deal

with the Patriots in order to raise cash to cover some of their

-3-

debts.

On October 19, 1987, the Sullivans met with Stephens,

Inc., a small investment banking firm in Little Rock, Arkansas.

They discussed a debt financing deal whereby Stephens would loan

the Sullivans $80 million dollars, with half going to the

Patriots and the other half to Chuck Sullivan's company which

owned the Patriots' stadium. The Patriots' portion of the loan

would be repaid out of the proceeds of the sale of 49% of the

Patriots through the offering of public stock. Stephens agreed

to look into the possibility of arranging the deal, but informed

the Sullivans that they would first have to get NFL approval.

Sullivan ultimately never obtained NFL approval and the deal with

Stephens never progressed beyond some preliminary discussions.

At a meeting of the NFL owners on October 27, 1987,

Sullivan raised his stock sale idea with the other owners and

asked for a modification of the NFL's policy against public

ownership to allow for certain controlled sales of minority

interests in NFL clubs. Alternatively, Sullivan requested a

waiver from the public ownership policy for his contemplated

public offering of the Patriots. Sullivan's request was

eventually tabled at this meeting. Discussions continued among

the owners and, at one point, Sullivan counted 17 of the 21

owners needed for approval as being in favor of allowing him to

make his public offering (seven owners were still undecided).

Pete Rozelle, NFL Commissioner at the time, told Sullivans that

he was not in favor of Sullivan's proposals and that league

-4-

approval was "very dubious." Sullivan ultimately never asked for

a vote on amending the ownership policy or on waiving the policy

for the Patriots, and the NFL never held such a vote. Sullivan

claims that he did not ask for a vote because it would have been

futile.

In October of 1988, Sullivan sold the Patriots for

approximately $83.7 million to KMS Patriots L.P. ("KMS"), a

limited partnership owned by Victor Kiam and Francis Murray.

Sullivan alleges that, absent the NFL's public ownership policy,

he would have been able to retain a majority share of a rapidly

appreciating asset with a high potential for future profits.

Instead, Sullivan asserts, he was forced to sell the Patriots at

a depressed price to private buyers.

On May 16, 1991, Sullivan sued the NFL claiming that,

among other things, the NFL had violated the Sherman Antitrust

Act, 15 U.S.C. 1-2, by preventing him from selling 49% of the

Patriots to the public in an equity offering. Sullivan alleged

that, as a result, he was forced to sell the entire team to a

private buyer at a fire sale price in order to pay off existing

debts. Prior to trial, the district court dismissed Sullivan's

claim under 2 of the Sherman Act along with various state law

claims. After a trial on Sullivan's claim under 1 of the

Sherman Act, the jury rendered a verdict for Sullivan in the

amount of $38 million, which the judge later reduced through

remittitur to $17 million. Pursuant to 15 U.S.C. 15, which

provides for treble damages for antitrust violations, the court

-5-

entered a final judgment for Sullivan of $51 million.

-6-

II. ANALYSIS

The NFL has raised a number of issues on appeal

concerning the application of 1 of the Sherman Act to the facts

of this case, which, according to the NFL, entitle it to judgment

as a matter of law. We address these issues first to see if the

present case should be dismissed, and we ultimately conclude that

it should not. We next address the NFL's allegations of trial

error and we find that several of them require that we overturn

the verdict in this case and order a new trial.

The first set of issues involves the district court's

denial of the NFL's motions for judgment as a matter of law under

Fed. R. Civ. P. 50. We review the court's decision de novo,

using the same stringent decisional standards that controlled the

district court. Gallagher v. Wilton Enterprises, Inc., 962 F.2d

120, 125 (1st Cir. 1992); Hendricks & Assocs., Inc. v. Daewoo

Corp., 923 F.2d 209, 214 (1st Cir. 1991). Under these standards,

judgment for the NFL can only be ordered if the evidence, viewed

in the light most favorable to Sullivan, points so strongly and

overwhelmingly in favor of the NFL, that a reasonable jury could

not have arrived at a verdict for Sullivan. Gallagher, 962 F.2d

at 124-25; Hendricks, 923 F.2d at 214.

III. ISSUES ALLEGEDLY REQUIRING JUDGMENT FOR THE NFL

A. Lack of Antitrust Injury

To establish an antitrust violation under 1 of the

Sherman Act, Sullivan must prove that the NFL's public ownership

policy is "in restraint of trade." Monahan's Marine, Inc. v.

-7-

Boston Whaler, Inc., 866 F.2d 525, 526 (1st Cir. 1989). Under

antitrust law's "rule of reason," the NFL's policy is in

restraint of trade if the anticompetitive effects of the policy

outweigh the policy's legitimate business justifications. Id. at

526-27 (citing Business Electronics Corp. v. Sharp Electronics

Corp., 485 U.S. 717, 723 (1988)). Anticompetitive effects, more

commonly referred to as "injury to competition" or "harm to the

competitive process," are usually measured by a reduction in

output and an increase in prices in the relevant market.

National Collegiate Athletic Ass'n v. Board of Regents of Univ.

of Okla., 468 U.S. 85, 104-07 (1984) ("Restrictions on price and

output are the paradigmatic examples of restraints of trade")

(hereinafter "NCAA"); Chicago Professional Sports Ltd.

Partnership v. National Basketball Association, 961 F.2d 667, 670

(7th Cir.), cert. denied, 113 S. Ct. 409 (1992). Injury to

competition has also been described more generally in terms of

decreased efficiency in the marketplace which negatively impacts

consumers. Town of Concord v. Boston Edison Co., 915 F.2d 17,

21-22 (1st Cir. 1990), cert. denied, 499 U.S. 931 (1991);

Interface Group, Inc. v. Massachusetts Port Auth., 816 F.2d 9, 10

(1st Cir. 1987). Thus, an action harms the competitive process

"when it obstructs the achievement of competition's basic goals -

- lower prices, better products, and more efficient production

methods." Town of Concord, 915 F.2d at 22.

The jury determined in this case, via a special verdict

form, that the relevant market is the "nationwide market for the

-8-

sale and purchase of ownership interests in the National Football

League member clubs, in general, and in the New England Patriots,

in particular." The jury went on to find that the NFL's policy

had an "actual harmful effect" on competition in this market.

The NFL argues on appeal that Sullivan has not

established the existence of any injury to competition, and thus

has not established a restraint of trade that can be attributed

to the NFL's ownership policy. The league's attack is two-fold,

asserting (1) that NFL clubs do not compete with each other for

the sale of ownership interests in their teams so there exists no

competition to be injured in the first place; and (2) Sullivan

did not present sufficient evidence of injury to competition from

which a reasonable jury could conclude that the NFL's policy

restrains trade. Although we agree with the NFL that

conceptualizing the harm to competition in this case is rather

difficult, precedent and deference to the jury verdict ultimately

require us to reject the NFL's challenge to the finding of injury

to competition.

Critically, the NFL does not challenge on appeal the

jury's initial finding of the relevant market and no

corresponding challenge was raised at trial.1 As a result, the

1 The NFL argues in passing that certain expert testimony
related to the relevant market issue was inherently unreasonable
and thus could not support the jury's relevant market finding.
We do not consider this passing argument to be sufficient to
raise the relevant market issue on appeal as matters averted to
in a perfunctory manner, unaccompanied by some effort at
developed argumentation, are deemed waived on appeal. United

States v. Innamorati, 996 F.2d 456, 468 (1st Cir. 1993). More

importantly, the NFL did not challenge the relevant market issue

-9-

NFL faces an uphill battle in its attack on the presence of an

injury to competition. Given the existence of a relevant market

for ownership interests in NFL teams, it is reasonable to presume

that a policy restricting the buying and selling of such

ownership interests injures competition in that market. The NFL

nevertheless maintains that NFL teams do not compete against each

other for the sale of their ownership interests, even if we

accept that a market exists for such ownership interests.

1. No Competition Subject to Injury as Matter of Law

The NFL correctly points out that member clubs must

cooperate in a variety of ways, and may do so lawfully, in order

to make the football league a success. See United States

Football League v. National Football League, 842 F.2d 1335, 1372

(2d Cir. 1988); Los Angeles Memorial Coliseum Comm'n v. National

Football League, 726 F.2d 1381, 1391-92 (9th Cir.), cert. denied,

469 U.S. 990 (1984) (hereinafter "L.A. Coliseum"); North American

Soccer League v. National Football League, 670 F.2d 1249, 1251

(2d Cir.), cert. denied, 459 U.S. 1074 (1982) (hereinafter

"NASL"). On the other hand, it is well established that NFL

clubs also compete with each other, both on and off the field,

for things like fan support, players, coaches, ticket sales,

local broadcast revenues, and the sale of team paraphernalia.

Mid-South Grizzlies v. National Football League, 720 F.2d 772,

in either its directed verdict motion or in its motion for
judgment as a matter of law. We will not consider arguments
which could have been, but were not, advanced below. Domegan v.

Fair, 859 F.2d 1059, 1065 (1st Cir. 1988).

-10-

786-87 (3d Cir. 1983), cert. denied, 467 U.S. 1215 (1984); L.A.

Coliseum, 726 F.2d at 1390, 1393, 1395, 1397. The question of

whether competition exists between NFL teams for sale of their

ownership interests, such that the NFL's ownership policy injures

this competition, is ultimately a question of fact. The NFL

would have us find, however, that, as a matter of law, NFL teams

do not compete against each other for the sale of their ownership

interests. We decline to make such a finding.

The NFL relies on a series of cases which allegedly

stand for the "well established" rule that a professional sports

league's restrictions on who may join the league or acquire an

interest in a member club do not give rise to a claim under the

antitrust laws. Seattle Totems Hockey Club, Inc. v. National

Hockey League, 783 F.2d 1347 (9th Cir.), cert. denied, 479 U.S.

932 (1986); Fishman v. Estate of Wirtz, 807 F.2d 520 (7th Cir.

1986); Mid-South Grizzlies, 720 F.2d at 772; Levin v. National

Basketball Ass'n, 385 F. Supp. 149 (S.D.N.Y. 1974). These cases,

all involving a professional sport's league's refusal to approve

individual transfers of team ownership or the creation of new

teams, do not stand for the broad proposition that no NFL

ownership policy can injure competition. See, e.g., NASL, 670

F.2d at 1259-61 (finding that the NFL's policy against cross-

ownership of NFL teams and franchises in competing sports

leagues, which also effectively barred certain owners who owned

other sports franchises from purchasing NFL teams, injured

competition between the NFL and competing sports leagues and thus

-11-

violated 1 of the Sherman Act).

None of the cases cited by the NFL considered the

particular relevant market that was found by the jury in this

case or a league policy against public ownership. Seattle Totems

and Mid-South Grizzlies considered potential inter-league

competition when a sports league rejected plaintiffs'

applications for new league franchises. Seattle Totems, 783 F.2d

at 1349-50; Mid-South Grizzlies, 720 F.2d at 785-86. Those

decisions found no injury to competition because the plaintiffs

were not competing with the defendant sports leagues, but rather,

were seeking to join those leagues. Seattle Totems, 783 F.2d at

1350; Mid-South Grizzlies, 720 F.2d at 785-86. Mid-South

Grizzlies left open the possibility that potential intra-league

competition between NFL football clubs could be harmed by the

NFL's action, but found that the plaintiff in that case had not

presented sufficient evidence of harm to such competition. Mid-

South Grizzlies, 720 F.2d at 786-87.

The Fishman and Levin cases concerned the National

Basketball Association's ("N.B.A.") rejection of plaintiffs'

attempts to buy an existing team. Fishman, 807 F.2d at 525-31;

Levin, 385 F. Supp. at 150-51. Those cases also based their

finding that there was no injury to competition on the fact that

the plaintiffs were seeking to join with, rather than compete

against, the N.B.A. Fishman, 807 F.2d at 544; Levin, 385 F.

Supp. at 152. Neither case considered whether competition

between teams for investment capital was injured. As pointed out

-12-

in Piazza v. Major League Baseball, 831 F. Supp. 420 (E.D.Pa.

1993), Fishman explicitly recognized the potential for

competition in the market for ownership of teams, although the

plaintiff had failed to raise the issue, and Levin simply

presumed, incorrectly, that there could never be any competition

among league members. Piazza, 831 F. Supp. at 430-31 & n.16

(citing Fishman, 807 F.2d at 532 n.9; and Levin, 385 F. Supp. at

152).

The important distinction to make between the cases

cited by the NFL and the present case is that here Sullivan

alleges that the NFL's policy against public ownership generally

restricts competition between clubs for the sale of their

ownership interests, whereas in the aforementioned cases, a

league's refusal to approve a given sale transaction or a new

team merely prevented particular outsiders from joining the

league, but did not limit competition between the teams

themselves. To put it another way, the NFL's public ownership

policy allegedly does not merely prevent the replacement of one

club owner with another -- an action having little evident effect

on competition -- it compromises the entire process by which

competition for club ownership occurs.2

2 This same argument distinguishes cases cited by the NFL for
the proposition that a franchisor's disapproval of a proposed
sale of a franchise does not give rise to an antitrust injury.
See Kestenbaum v. Falstaff Brewing Corp., 514 F.2d 690 (5th Cir.

1975), cert. denied, 424 U.S. 943 (1976); McDaniel v. General

Motors Corp., 480 F. Supp. 666 (E.D.N.Y. 1979). Individual

decisions to block the sale of a franchise do not implicate the
harm to competition that is caused by a policy restricting all
sales of a certain type of ownership interest. Only the broad-

-13-

We take a moment to briefly address a related argument

raised by the NFL to the effect that NFL clubs are unable to

conspire with each other under 1 of the Sherman Act because

they function as a single enterprise in relation to the league's

public ownership policy. The NFL asserts that the Supreme

Court's holding in Copperweld Corp. v. Independence Tube Corp.,

467 U.S. 752 (1984), controls the facts of this case and

overturns prior caselaw holding that NFL clubs do not constitute

a single enterprise but rather, are separate entities which were

capable of conspiring with each other under 1. See L.A.

Coliseum, 726 F.2d at 1387-90; NASL, 670 F.2d at 1256-58.

We do not agree that Copperweld, which found a

corporation and its wholly owned subsidiary to be a single

enterprise for purposes of 1, Copperweld, 467 U.S. at 771,

applies to the facts of this case or affects the prior precedent

concerning the NFL. See McNeil v. National Football League, 790

F. Supp. 871, 879-80 (D.Minn. 1992) (holding that Copperweld did

not apply to the NFL and its member clubs and finding the clubs

to be separate entities capable of conspiring together under

1). Copperweld's holding turned on the fact that the subsidiary

of a corporation, although legally distinct from the corporation

itself, "pursue[d] the common interests of the whole rather than

interests separate from those of the corporation itself."

Copperweld, 467 U.S. at 770. As emphasized in City of Mt.

based policy has the potential to compromise the entire
competitive process for the buying and selling of a good in a
relevant market.

-14-

Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268

(8th Cir. 1988), upon which the NFL relies for the application of

Copperweld to this case, the critical inquiry is whether the

alleged antitrust conspirators have a "unity of interests" or

whether, instead, "any of the defendants has pursued interests

diverse from those of the cooperative itself." Id. at 274-77

(defining "diverse" as "interests which tend to show that any two

of the defendants are, or have been, actual or potential

competitors"). As we have already noted, NFL member clubs

compete in several ways off the field, which itself tends to show

that the teams pursue diverse interests and thus are not a single

enterprise under 1.

Ultimately, the NFL's Copperweld challenge is subsumed

under the question of whether or not the evidence can support a

finding that NFL teams compete against each other for the sale of

their ownership interests. Proof of such competition defeats

both the NFL's challenge to the existence of an injury to

competition and the NFL's Copperweld argument as well.

Insufficient proof of such competition would require a judgment

in favor of the NFL anyway, regardless of the implications under

Copperweld. As we discuss below, the jury's finding that there

exists competition between teams for the sale of ownership

interests was based on sufficient evidence.

2. Insufficient Evidence of Harm to Competition

The NFL contends that Sullivan did not present

sufficient evidence concerning: (1) the existence of competition

-15-

between NFL clubs for the sale of ownership interests, or (2) a

decrease in output, an increase in prices, a detrimental effect

on efficiency or other incidents of harm to competition in the

relevant market, from which a reasonable jury could conclude that

the NFL's policy injured competition. Although we agree that the

evidence of all these factors is rather thin, we disagree that

the evidence is too thin to support a jury verdict in Sullivan's

favor.

With respect to evidence of the existence of

competition for the sale of ownership interests, one of

Sullivan's experts, Professor Roger Noll, testified that "one of

the ways in which the NFL exercises monopoly power in the market

for the franchises and ownership is by excluding certain people

from owning all or part -- any type part of an NFL franchise."

Dr. Noll explained that this "enables a group of owners, in this

case, you only need eight owners, to exclude from the League and

from competing with them, people who might be more effective

competitors than they are." The record also contains statements

from several NFL owners which could reasonably be interpreted as

expressions of concern about their ability to compete with other

teams in the market for investment capital in general, and for

the sale of ownership interests in particular. For example,

Arthur Rooney II of the Pittsburgh Steelers stated in a letter

that he did not "believe that the individually or family owned

teams will be able to compete with the consolidated groups."

Ralph Wilson of the Buffalo Bills stated that big corporations

-16-

should not own teams because it gives them an "unfair competitive

advantage" over other teams since corporations will funnel money

into the team and make it "more competitive" than the other

franchises. Former NFL Commissioner Pete Rozelle admitted that

similar sentiments had been expressed by NFL members.

Although it is not precisely clear that the

"competition" about which Noll, Rooney, and Wilson were

discussing is the same competition at issue here -- that is

competition for the sale of ownership interests -- a jury could

reasonably interpret these statements as expressing a belief that

the competition exists between teams for the sale of ownership

interests. The statements of the two NFL owners imply that

greater access to capital for all teams will put increased

pressure on some teams to compete with others for that capital,

and all the statements reveal that the ownership rules,

particularly the rule against public ownership, is the main

obstacle preventing such access. The fact that ownership by

"consolidated groups" is not necessarily the same as public

ownership does not affect the conclusion that teams face

competitive pressure in selling their ownership interests

generally to whoever might buy them. We also note that evidence

of actual, present competition is not necessary as long as the

evidence shows that the potential for competition exists. See L.

A. Coliseum, 726 F.2d at 1394 (discussing significance of

potential competition, especially where challenged policy limits

such competition so that it is not evident in practice). It

-17-

would be difficult indeed to provide direct evidence of

competition when the NFL effectively prohibits it.

The NFL focusses on the fact that Professor Noll

testified that many of the purchasers of Patriots' stock would be

New England sports fans and others in the New England area. The

NFL points out that other NFL teams would not compete with the

Patriots for the sale of stock to their own fans. This argument

slightly distorts Professor Noll's testimony. Professor Noll

stated that local souvenir buyers would be one portion of the

market for Patriots stock. Professor Noll also testified several

times that other investors would buy Patriots stock as well, for

investment purposes. Noll's point was that the souvenir buyers

would serve to bid up the price of the stock above what the price

would normally be if the Patriots were a regular company. His

testimony did not preclude a finding that NFL teams compete

against each other for investment capital via the sale of

ownership interests.

The record also contains sufficient evidence of the

normal incidents of injury to competition from the NFL's policy -

- reduced output, increased prices, and reduced efficiency -- to

support the jury's verdict. As Dr. Noll pointed out in his

testimony, the NFL's policy "excludes individuals . . . who might

want to own a share of stock in a professional football team."

Several NFL officials themselves admitted that the policy

restricts the market for investment capital among NFL teams.

There is thus little dispute that the NFL's ownership policy

-18-

reduces the available output of ownership interests.

The NFL is correct that, in one sense, the overall pool

of potential output is fixed because there are only 28 NFL teams

and, although their value may fluctuate, the quantity of their

ownership interests cannot. However, the NFL's public ownership

policy completely wipes out a certain type of ownership interest

-- public ownership of stock. By restricting output in one form

of ownership, the NFL is thereby reducing the output of ownership

interests overall. In other words, the NFL is literally

restricting the output of a product -- a share in an NFL team.

There was considerable testimony concerning the price

effects of the NFL policy. Both of Sullivan's experts testified

that the policy depressed the price of ownership interests in NFL

teams because NFL franchises would normally command a premium on

the public market relative to their value in the private market,

which is all that the league currently permits. Professor Noll

testified that fan loyalty would push up the price of ownership

interests if sales to the public were allowed. Even former

Commissioner Pete Rozelle acknowledged that "it was pointed out,

with justification, it has been over the years, that [the

ownership policy] does restrict your market and, very likely, the

price you could get for one of our franchises if you wanted to

sell it, because you are eliminating a very broad market . . . .

And they have said that there is a depression on the price they

could get for their franchise."

The NFL points out that the alleged effect of its

-19-

ownership policy is to reduce prices of NFL team ownership

interests, rather than to raise prices which is normally the

measure of an injury to competition. E.g., Town of Concord, 915

F.2d at 22. We acknowledge that it is not clear whether, absent

some sort of dumping or predatory pricing, see, e.g., Monahan's

Marine, Inc. v. Boston Whaler, Inc., 866 F.2d 525, 527 (1st Cir.

1989), a decrease in prices can indicate injury to competition in

a relevant market. The Supreme Court has emphasized, however,

that overall consumer preferences in setting output and prices is

more important than higher prices and lower output, per se, in

determining whether there has been an injury to competition.

NCAA, 468 U.S. at 107. In this case, regardless of the exact

price effects of the NFL's policy, the overall market effects of

the policy are plainly unresponsive to consumer demand for

ownership interests in NFL teams. Dr. Noll testified that fans

are interested in buying shares in NFL teams and that the NFL's

policy deprives fans of this product. Moreover, evidence was

presented concerning the public offering of the Boston Celtics

professional basketball team which demonstrated, according to

some of the testimony, fan interest in buying ownership of

professional sports teams. Thus, a jury could conclude that the

NFL's policy injured competition by making the relevant market

"unresponsive to consumer preference." Id.3

3 The NFL maintains that price and output are not affected
because its ownership policy does not limit the number of games
or teams, does not raise ticket prices or the prices of game
telecasts and does not affect the normal consumer of the NFL's
product in any other way. Such facts might be relevant to an

-20-

As for overall efficiency of production in the relevant

market,4 Sullivan's experts testified that the NFL's policy

hindered efficiency gains, and that allowing public ownership

would make for better football teams. Professor Noll stated that

the NFL's public ownership policy prevented individuals who might

be "more efficient and much better at running a professional

football team" from owning teams. Dr. Noll also stated that

publicly owned NFL teams would be better managed, and produce

higher quality entertainment for the fans. Noll testified that

the ownership rule excluded certain types of management

structures which would likely be more efficient in running the

teams, resulting in higher franchise values. One NFL owner,

Lamar Hunt, acknowledged that increased access to capital can

improve a team's operations and performance. A memorandum

prepared by an NFL staff member stated that changes to the NFL's

inquiry of whether the NFL's policy harms overall efficiency, see

infra note [4], but it is not relevant to whether the policy

affects output and prices in the relevant market for ownership

interests. Just because consumers of "NFL football" are not
affected by output controls and price increases does not mean
that consumers of a product in the relevant market are not so
affected. In this case, two types of consumers are denied
products by the NFL policy: consumers who want to buy stock of
the Patriots or other teams, and consumers like Sullivan who want
to "purchase" investment capital in the market for public
financing.

4 Although the product at issue in the relevant market is
"ownership interests," efficiency in production of that product
can be measured by the value of the ownership interest. That is,
an improved product produced more efficiently will be reflected
in the value of the output in question (regardless of the price).
In this case, the value of the product depends on the success of
the Patriots' football team, the overall efficiency of its
operations, and the success of the NFL in general.

-21-

public ownership policy could contribute to each NFL team's own

financial strength and viability, which in turn would benefit the

entire NFL because the league has a strong interest in having

strong, viable teams.

The NFL presented a large amount of evidence to the

contrary and now claims on appeal that Sullivan's position was

based on nothing more than sheer speculation. We have reviewed

the record, however, and we cannot say that the evidence was so

overwhelming that no reasonable jury could find against the NFL

and in favor of Sullivan. We therefore refuse to enter judgment

in favor of the NFL as a matter of law.

B. Ancillary Benefits

The NFL next argues that even if its public ownership

policy injures competition in a relevant market, it should be

upheld as ancillary to the legitimate joint activity that is "NFL

football" and thus not violative of the Sherman Act. We take no

issue with the proposition that certain joint ventures enable

separate business entities to combine their skills and resources

in pursuit of a common goal that cannot be effectively pursued by

the venturers acting alone. See, e.g., Broadcast Music, Inc. v.

Columbia Broadcasting System, Inc., 441 U.S. 1 (1979). We also

do not dispute that a "restraint" that is ancillary to the

functioning of such a joint activity -- i.e. one that is required

to make the joint activity more efficient -- does not necessarily

violate the antitrust laws. Broadcast Music, 441 U.S. at 23-25;

Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210,

-22-

at 223-24 (D.C. Cir. 1986), cert. denied, 479 U.S. 1033 (1987);

see also Northwest Wholesale Stationers, Inc. v. Pacific

Stationery & Printing Co., 472 U.S. 284, 295-96 (1985). We

further accept, for purposes of this appeal, that rules

controlling who may join a joint venture can be ancillary to a

legitimate joint activity and that the NFL's own policy against

public ownership constitutes one example of such an ancillary

rule. Finally, we accept the NFL's claim that its public

ownership policy contributes to the ability of the NFL to

function as an effective sports league, and that the NFL's

functioning would be impaired if publicly owned teams were

permitted, because the short-term dividend interests of a club's

shareholder would often conflict with the long-term interests of

the league as a whole. That is, the policy avoids a detrimental

conflict of interests between team shareholders and the league.

We disagree, however, that these factors are sufficient

to establish as a matter of law that the NFL's ownership policy

does not unreasonably restrain trade in violation of 1 of the

Sherman Act. The holdings in Broadcast Music, Rothery Storage,

and Northwest Stationers, do not throw the "rule of reason" out

the window merely because one establishes that a given practice

among joint venture participants is ancillary to legitimate and

efficient activity -- the injury to competition must still be

weighed against the purported benefits under the rule of reason.

See, e.g., Broadcast Music, 441 U.S. at 24 (holding only that a

particular ancillary restraint did not constitute a per se

-23-

violation of the Sherman Act and remanding for a determination of

the case under a rule of reason analysis); Northwest Stationers,

472 U.S. at 293-98 (same); see also SCFC ILC, Inc. v. Visa U.S.A.

Inc., 819 F. Supp. 956, 979-80 (D.Utah 1993) (finding that the

existence of a joint venture may save a restraint from per se

illegality but not from the normal rule of reason scrutiny).

One basic tenet of the rule of reason is that a given

restriction is not reasonable, that is, its benefits cannot

outweigh its harm to competition, if a reasonable, less

restrictive alternative to the policy exists that would provide

the same benefits as the current restraint. L.A. Coliseum, 726

F.2d at 1396. The record contains evidence of a clearly less

restrictive alternative to the NFL's ownership policy that would

yield the same benefits as the current policy. Sullivan points

to one proposal to amend the current ownership policy by allowing

for the sale of minority, nonvoting shares of team stock to the

public with restrictions on the size of the holdings by any one

individual. Dividend payments, if any, would be within the firm

control of the NFL majority owner. Under such a policy, it would

be reasonable for a jury to conclude that private control of

member clubs is maintained, conflicts of interest are avoided,

and all the other "benefits" of the NFL's joint venture

arrangement are preserved while at the same time teams would have

access to the market for public investment capital through the

sale of ownership interests.

C. Causation of Injury in Fact

-24-

The NFL next argues that Sullivan did not present

sufficient evidence to support a finding by the jury that the

NFL's public ownership policy caused injury in fact to Sullivan.

An antitrust plaintiff must prove that he or she suffered damages

from an antitrust violation and that there is a causal connection

between the illegal practice and the injury. Associated General

Contractors, Inc. v. California State Council of Carpenters, 459

U.S. 519, 532-33 & n.26 (1983); Blue Shield of Virginia v.

McCready, 457 U.S. 465, 476-78 (1982); Engine Specialties, Inc.

v. Bombardier Ltd., 605 F.2d 1, 13 (1st Cir. 1979), cert. denied,

446 U.S. 983 (1980). "Plaintiffs need not prove that the

antitrust violation was the sole cause of their injury, but only

that it was a material cause." Engine Specialties, 605 F.2d at

14.

Sullivan asserted at trial that the NFL's ownership

policy forced him to sell the Patriots at a depressed price, far

below what the team would have been worth in a market that

included public ownership of the team. "But for" the NFL's

policy, Sullivan claims, he would have been able to offer 49% of

the Patriots to the public for $70 million, pay off his debts,

and retained ownership of a much more valuable and profitable

team.

The NFL contends that Sullivan failed to establish a

causal connection between his "forced" sale of the Patriots and

the NFL's ownership policy because (1) Sullivan never officially

requested a vote on his proposals to amend or waive the policy so

-25-

there is no way of knowing whether the policy would have

prevented a public offering in the first place; and (2) Sullivan

never established that the public stock sale was feasible or

potentially successful and thus an alternative to what ultimately

happened (i.e., even if the NFL did not have a policy against

public ownership, Sullivan would still have had to sell his team

because the Patriots stock sale would not have happened or would

not have raised enough money to pay off Sullivan's debts and

prevent a fire sale of the team). Although the evidence of

causation is not overwhelming, it is nevertheless sufficient to

support the verdict.

Regarding the NFL's first claim that Sullivan never

called for a vote from the owners to change or waive the

ownership policy, Sullivan presented sufficient evidence to show

that the NFL essentially rejected Sullivan's request, even though

no official vote was taken. Under certain circumstances, an

antitrust plaintiff must make a demand on the defendant to allow

the plaintiff to take some action or obtain some benefit, which

the defendant's challenged practice is allegedly preventing the

plaintiff from taking or obtaining, in order to prove that the

practice caused injury in fact to the plaintiff. See Wells Real

Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 816

(1st Cir.), cert. denied, 488 U.S. 955 (1988); Out Front

Productions, Inc. v. Magid, 748 F.2d 166, 170 (3d Cir. 1984).

Such a requirement only applies, however, where the plaintiff

cannot otherwise prove that the illegal practice exists or that

-26-

the practice is preventing the plaintiff from competing in the

relevant market; in such cases, a refused demand is the only

reliable evidence of causation. Out Front, 748 F.2d at 169-70.

In cases like the present one, an official request and official

refusal is not necessary to establish causality because there is

other evidence showing that defendant's practice caused injury in

fact to the plaintiff. Zenith Radio Corp. v. Hazeltine Research,

395 U.S. 100, 120 n.15 (1969); Continental Ore Co. v. Union

Carbide & Carbon Corp., 370 U.S. 690, 699-702 (1962). There is

certainly no blanket requirement, as the NFL maintains, in Wells

or any other case, that Sullivan must call for a vote and obtain

an official refusal from the NFL, even if such a request would be

futile. See, e.g., Wells, 850 F.2d at 816 (finding failure to

request access to multiple listing service was critical because

"[t]here was no evidence of a group boycott;" although court

noted request "may have been futile," there was no evidence to

indicate that it would have been, so an actual request was

required); Chicago Ridge Theatre Ltd. Partnership v. M & R

Amusement Corp., 855 F.2d 465, 470 (7th Cir. 1988) (futility

obviates the need for a demand). Certainly, if Sullivan can

prove futility independent of any official request, he need not

show that he actually called for a vote and received a denial

from the other NFL owners.

The jury in this case heard evidence that would allow

it to conclude that the NFL effectively denied Sullivan's request

for a waiver or amendment of the public ownership policy, and

-27-

that an official vote would indeed have been futile. The NFL's

policy against public ownership was long-standing, and the policy

withstood several efforts to change it over the years as

proffered amendment proposals were never brought to a vote.

Sullivan requested a wavier of, or amendment to, the policy at a

meeting of the owners on October 27, 1987. His request was

tabled. After further discussions, then-Commissioner Pete

Rozelle said that he opposed the proposal and that the chances

for league approval were "very dubious." Although Sullivan was

only four votes shy of winning a vote, with seven votes still

undecided, the jury could reasonably conclude that, in light of

the Commissioner's statement, Sullivan tried but failed to

convince those undecided owners to vote in his favor and that an

actual vote would have been futile. The evidence is thus

sufficient to support a finding that the NFL's policy was

effectively enforced against Sullivan and that the policy did in

fact, when considered with the evidence discussed below, prevent

Sullivan from making his public offering of 49% of the Patriots.

Sullivan also presented sufficient evidence to support

a finding that the Patriots stock sale was both feasible and

potentially successful. Sullivan met with Stephens, Inc., an

investment banking firm, to discuss a deal whereby Stephens would

arrange for a loan of $80 million to Sullivan and his son, half

of which would be paid back out of the proceeds of the Patriots

stock offering, which Stephens would also arrange. In a

subsequent letter, Stephens stated that it had been retained to

-28-

assist in the "private placement of $80 million of debt" and set

out some preliminary terms and conditions. Although specifics of

the public offering were not discussed, and Stephens did not

determine whether the stock offering was ultimately feasible,

Stephens repeatedly made it clear to Sullivan that NFL approval

was required -- indeed Stephens specifically singled out NFL

approval as the prerequisite -- before Stephens could proceed any

further with efforts to prepare for the placement of Patriots

stock.

As discussed above, NFL approval was never obtained.

Therefore, the jury could conclude that lack of approval was the

reason Stephens was unwilling to proceed with the deal, even

though Stephens also expressed some concern about Sullivan's

financial and legal troubles. The jury also heard testimony that

Charles Allen, a prominent investment banker in New York, thought

the Patriots public offering was feasible and that he was

potentially interested in arranging the deal. Sullivan himself

testified that the stock sale was feasible based on his

experience with the previous public offering of Patriots stock in

1960, and based on the public offering of the Boston Celtics.

Finally, one of Sullivan's experts, Patrick Brake, testified that

the public offering would have been feasible had the NFL not

blocked it.

In addition, despite significant financial and legal

problems with the Patriots, the evidence is sufficient to support

a finding that Sullivan could have solved these problems in the

-29-

course of the public offering and, further, that he could have

brought off a successful stock sale that would have raised at

least $70 million.

The NFL focusses its challenge to the potential success

of Sullivan's offering on the testimony of Patrick Brake, who

provided the $70 million figure as the value for the stock sale.

According to the NFL, Brake's testimony could not support the

jury's finding on causation because it was not supported by any

facts, it was not grounded in any rational methodology, and it

ignored important factors indicating that the Patriots offering

would not be a success. The NFL does not challenge the

admissibility of Brake's opinion but, instead, claims that his

opinion cannot support the jury's finding that the Patriots stock

sale would have been a success if the NFL had allowed it to

happen.

"When an expert opinion is not supported by sufficient

facts to validate it in the eyes of the law, or when indisputable

record facts contradict or otherwise render the opinion

unreasonable, it cannot support a jury's verdict." Brooke Group,

Ltd. v. Brown & Williamson Tobacco Corp., 113 S. Ct. 2578, 2589

(1993); accord Price v. General Motors Corp., 931 F.2d 162, 165

(1st Cir. 1991); Richardson v. Richardson-Merrell, Inc., 857 F.2d

823, 829 (D.C. Cir. 1988), cert. denied, 493 U.S. 882 (1989). A

jury verdict cannot rest solely on an expert's "bottom line"

conclusion, without some underlying facts and reasons, or a

logical inferential process to support the expert's opinion.

-30-

Mid-State Fertilizer Co. v. Exchange National Bank, 877 F.2d

1333, 1339 (7th Cir. 1989).

We agree that the facts and reasoning underlying

Brake's opinions and testimony leave much to be desired from the

standpoint of a factfinder charged with determining the facts.

As a matter of law, however, Brake provided enough of a basis for

his opinions and had sufficient facts to back his opinions up, to

support, in combination with the evidence from other sources, a

jury finding of potential success of the Patriots stock sale

venture. To begin with, Brake stated in his testimony that his

opinion was based on a review of documents and depositions in the

case, a review of the prospectus for the Boston Celtics public

offering, the fact that future television revenues for the

Patriots were likely to increase due to the Patriots' appearance

in the Super Bowl, and the fact that the public stock for NFL

teams, like the Patriots, would trade at a premium value over

what the club would otherwise be worth. Brake also stated that

he looked at a financial statement of the Patriots and was

apprised of some of the debt and loss history of the club. Other

testimony and evidence at trial supported the claim that stock of

NFL teams would sell for a premium above the club's private sale

value and the claim that TV revenues to the NFL teams would

increase. Sullivan himself testified that a public offering

would be successful based upon the success of his earlier

offering of Patriots stock and on the results of the Celtics

public offering. There was also testimony -- highly disputed,

-31-

but potentially credible testimony nonetheless -- to the effect

that the Celtics' stock offering was a success and that the

Patriots stock offering could be patterned after the Celtics

offering.

As for the source of Brake's specific $70 million

figure for the likely proceeds from a sale of 49% of the

Patriots, Brake explained a two-step public offering process

which, after subtracting underwriting fees, would yield the

Sullivan's $70 million. Brake arrived at this figure after

starting with a base value of $150 million for the Patriots.

Given the $80 million private sale price of the Patriots obtained

by Sullivan when he actually sold the team, and given the

testimony by Brake and others that public stock of NFL teams

would sell at a premium, we cannot say that the opinion by Brake,

an investment banking expert, was unreasonable or "not supported

by sufficient facts to validate it in the eyes of the law."

Brooke Group, 113 S. Ct. at 2589.

Brake's testimony was not merely conclusory. Rather,

it was embellished by various explanations and justifications.

His testimony was also not overwhelmingly contradicted by the

weight of the evidence or inherently contradictory, unreasonable

or irrational. Brake did overlook some important factors that

contradicted his opinion, but he was questioned about these

factors on cross-examination and the NFL argued them before the

jury. The factors do not invalidate Brake's opinion as a matter

of law; rather, they merely go to the weight and credibility of

-32-

his opinions which are matters for the jury to consider. The

basis of the opinion regarding the success of the Patriots public

offering may be flimsy, but it is not nonexistent or irrational

as a matter of law.

Although we share the NFL's skepticism that Sullivan

would have succeeded in his public offering if the NFL had

allowed him to try it, we cannot say that, as a matter of law,

the evidence was so overwhelming that no reasonable jury could

find that the NFL's policy harmed Sullivan by preventing him from

doing something he would otherwise have been able to do. We

therefore reject the NFL's claim that it is entitled to a

judgment in its favor on the basis that Sullivan failed to prove

his injury was caused by the alleged antitrust violation.

D. Assignment of Antitrust Claim

The NFL argues that Sullivan cannot bring this lawsuit

because he sold his antitrust claim when he sold the Patriots.

The sale contract between Sullivan and KMS Patriots, L.P.,

provided that Sullivan transferred to the buyers "all other

assets" of the Patriots' and its holding company,5 besides those

specifically listed and those specifically excluded. None of the

listed or excluded assets include an antitrust claim. According

to the NFL, the term "all other assets" should be interpreted

5 The language of the contract actually states "all other assets
of Selling Group," which includes Sullivan himself. However,
neither party asserts that Sullivan intended to transfer all his
personal assets with this clause and, anyway, the "all other
assets" clause is number seventeen on a list of items referred to
by the contract as "the following assets of the Club and Holdco
[the Patriots' holding company]."

-33-

broadly to include the present antitrust cause of action. We

disagree. Absent some express language to the effect that

Sullivan was selling his football related "antitrust claims" or,

at the very least, "causes of action," we cannot find that

Sullivan assigned the present antitrust claim to the buyers of

the Patriots. Gulfstream III Assocs., Inc. v. Gulfstream

Aerospace Corp., 995 F.2d 425, 437-40 (3d Cir. 1993); see also

Lerman v. Joyce Int'l, Inc., 10 F.3d 106, 112 (3d Cir. 1993)

(affirming requirement in Gulfstream that assignment of claim

must be "express" but expanding definition of "express" language

to include a grant of "all causes of action, claims and demands

of whatsoever nature"). As no such express language appears in

the contract for the sale of the Patriots, Sullivan did not

transfer his interest in the present lawsuit to KMS Patriots when

he sold the team.

The NFL's arguments concerning the application of 1

of the Sherman Act to the facts of this case raise a substantial

challenge to the jury verdict and are certainly weighty enough to

give us pause. Upon careful consideration of the issues,

however, we find Sullivan's theory of the case to be a plausible

one and ultimately find the evidence sufficient to support it.

For the foregoing reasons, therefore, we see no justification, as

a matter of law, for ringing the death knell on this litigation.

IV. TRIAL ERRORS

Having reviewed those issues which would have warranted

a judgment in favor of the NFL, had we decided any of those

-34-

issues in the NFL's favor, we now turn to the NFL's claim that it

is entitled to a new trial because of allegedly erroneous jury

instructions and other trial errors. In particular, the NFL

asserts that the district court failed to provide the jury with

several crucial jury instructions that were required in order to

present to the jury certain legal theories that were potentially

dispositive of the verdict. The NFL argues that the court's

failure to give the instructions was prejudicial error requiring

a new trial.

Determining whether the failure to give proffered jury

instructions is error depends on whether the instructions

actually given to the jury, taken as a whole, adequately

explained the law or whether they tended to confuse or mislead

the jury on the controlling issues of the case. Davet v.

Maccarone, 973 F.2d 22, 26 (1st Cir. 1992); Transnational Corp.

v. Rodio & Ursillo, Ltd., 920 F.2d 1066, 1070 (1st Cir. 1990);

see also L.A. Coliseum, 726 F.2d at 1398 ("The question, then, is

whether, viewing the jury instructions as a whole, the trial

judge gave adequate instructions on each element of the case to

insure that the jury fully understood the issues."). We must

also consider whether the NFL's proposed instructions are

accurate or misleading. Shane v. Shane, 891 F.2d 976, 987 (1st

Cir. 1989). "As long as the judge's instruction properly

apprises the jury of the applicable law, failure to give the

exact instruction requested does not prejudice the objecting

party." Brown v. Trustees of Boston Univ., 891 F.2d 337, 354

-35-

(1st Cir. 1989), cert. denied, 496 U.S. 937 (1990) (internal

quotations omitted). A party, however, is entitled to have its

legal theories on controlling issues, which are supported by the

law and by the evidence, presented to the jury. Jerlyn Yacht

Sales, Inc. v. Roman Yacht Brokerage, 950 F.2d 60, 68 (1st Cir.

1991); L.A. Coliseum, 726 F.2d at 1398. An error in the jury

instructions will warrant the reversal of the judgment and a new

trial only if, upon review of the record as a whole, the error is

determined to be prejudicial. Davet, 973 F.2d at 26; Jerlyn

Yacht Sales, 950 at 69; Transnational Corp., 920 F.2d at 1070.

In this case, we find that the failure to give certain

instructions was prejudicial error6 and we therefore vacate the

judgment and order a new trial.

A. Equal Involvement Defense

The NFL argued before the district court that Sullivan

was a complete and substantially equal participant in the NFL's

ownership policy which he now challenges in the present lawsuit.

As a result of Sullivan's involvement, the NFL claimed, Sullivan

was barred from bringing a damages action under the antitrust

laws pursuant to the "equal involvement defense" doctrine. The

district court denied motions for summary judgment and a directed

verdict on this issue and, further, refused to instruct the jury

on the availability of the defense because it found that the

6 The court's failure to instruct on the complete involvement
defense was prejudicial error and, by itself, sufficient grounds
for reversal and a new trial. We do not decide whether any of
the other errors, standing alone, are prejudicial. We do hold,
however, that all the errors taken together are prejudicial.

-36-

evidence showed that Sullivan "had very little, if any,

involvement in the formulation of [the public ownership] rule,"

and because the rule "was imposed on [Sullivan] by a preexisting

National Football League rule." This ruling constituted

prejudicial error because the "equal involvement defense" is an

absolute defense to an antitrust claim and because the evidence

warranted sending the issue to the jury.

A plaintiff's "complete, voluntary, and substantially

equal participation" in an illegal practice under the antitrust

laws precludes recovery for that antitrust violation. CVD, Inc.

v. Raytheon Co., 769 F.2d 842, 856 (1st Cir. 1985), cert. denied,

475 U.S. 1016 (1986); General Leaseways, Inc. v. National Truck

Leasing Ass'n, 830 F.2d 716, 720-23 (7th Cir. 1987); THI-Hawaii,

Inc. v. First Commerce Financial Corp., 627 F.2d 991, 995 (9th

Cir. 1980); see also Bateman Eichler, Hill, Richards, Inc. v.

Berner, 472 U.S. 299, 310-11 (1985) (applying equal involvement

defense in securities law context). In order to establish an

"equal involvement" defense, an antitrust defendant must prove,

by a preponderance of the evidence, that the plaintiff bears at

least substantially equal responsibility for an anticompetitive

restriction by creating, approving, maintaining, continually and

actively supporting, relying upon, or otherwise utilizing and

implementing, that restriction to his or her benefit.7 General

7 The Supreme Court in Bateman added an additional requirement

to the "equal involvement" defense: that "preclusion of suit
would not significantly interfere with the effective enforcement
of" the antitrust laws. Bateman, 472 U.S. at 311. We do not see

a preclusion of Sullivan's damages action as presenting any

-37-

Leaseways, 830 F.2d at 720-26; CVD, 769 F.2d at 856. It is not

essential to the defense that the plaintiff actually helped

author or create the policy, although such facts would be highly

probative, as long as the plaintiff was substantially responsible

for maintaining and otherwise effectuating the policy. See,

e.g., General Leaseways, 830 F.2d at 723 (applying equal

involvement defense in case where plaintiff did not participate

in the actual adoption of the policy although plaintiff was

substantially involved in supporting, enforcing and maintaining

the policy).8 On the other hand, proof that the plaintiff

benefitted from the challenged policy or failed to object to the

policy, without more, is not sufficient to show "substantially

equal participation." See id., 830 F.2d at 725 (noting that

"mere participation" in the challenged policy is not enough).

Moreover, proof that the plaintiff was coerced ("economically" or

significant interference with antitrust law enforcement. The
NFL's policy is still subject to challenge under the antitrust
laws. Because the equal involvement defense only precludes a
damages action, Sullivan could have requested injunctive relief
when the public ownership policy was allegedly preventing him
from selling 49% of his team. In addition, other owners who were
not involved in the adoption or support of the policy may still
bring suit should they desire to sell ownership interests in
their team to the public.

8 To the extent this conflicts with the "but for" standard
applied in THI-Hawaii, 627 F.2d at 995 (finding that "a

plaintiff's recovery is not barred unless the illegal conspiracy
would not have been formed but for its participation"), we

decline to follow that portion of the case. There is no evidence
of such a rigid "but for" requirement in the Supreme Court's
formulation of the equal involvement defense in Bateman, 472 U.S.

at 310-11 (finding the defense applies where "as a direct result
of his own actions, the plaintiff bears at least substantially
equal responsibility for the violations he seeks to redress").

-38-

otherwise) into supporting the policy, that the plaintiff

attempted to oppose the illegal conduct, or that the plaintiff's

participation was otherwise not voluntary, is highly probative of

the absence of complete and equal involvement by the plaintiff in

an antitrust violation. E.g., CVD, 769 F.2d at 856.

In this case, the evidence in the record was sufficient

to support a jury instruction on the equal involvement defense.

Sullivan was one of the three AFL members on the Joint Committee

that established the policies, including the ownership policies,

that were to govern the new expanded NFL. That Committee agreed,

in a merger agreement signed by Sullivan, to adopt the NFL's

policy against public ownership for the new NFL. Sullivan's son,

Chuck, stated that Sullivan was the central figure in the merger

negotiations. Sullivan subsequently relied on the NFL's public

ownership policy to justify his purchase, through the merger of

his team into a wholly owned company, of the outstanding stock of

the Patriots in 1976. In the proxy statement for that

transaction, Sullivan listed the NFL's policy against public

ownership as one of the "Reasons for the Merger", and he attached

a letter from the NFL justifying the public ownership policy and

explaining that the continued presence of public stockholders

conflicted with the interests of the league. Sullivan also

affirmatively supported the policy in sworn testimony during the

litigation with his former shareholders following the Patriots

merger. Sullivan stated that the NFL's public ownership policy,

and the justifications underlying the policy, were the reasons

-39-

for his desire to purchase all outstanding shares of the team.

There is no evidence that Sullivan ever opposed or objected to

theownership policypriorto thecircumstances surroundingthis case.

Taken together, this evidence is sufficient for a

reasonable jury to conclude that Sullivan bears substantially

equal responsibility for the NFL's public ownership policy

because Sullivan helped adopt the policy, he relied upon it, and

he actively supported it. The jury, however, was never given an

opportunity to consider this evidence in light of the equal

involvement defense.

Sullivan claims that he was not at the meetings in

which Lamar Hunt, the chairman of the AFL committee, agreed to

the NFL's public ownership policy, and that he did not know in

advance that the old NFL's public ownership rule would be adopted

by the new NFL. Mr. Hunt himself testified, however, that he

always spoke for the entire AFL committee at his various meetings

with NFL owners, and that he discussed various negotiating points

with the other AFL owners, including Sullivan, before any

decisions were made. Moreover, Sullivan's own team obtained a

specific waiver from the ownership policy, which, a reasonably

jury could infer, indicates that Sullivan was involved in the

decision to adopt the policy. In any event, it is the jury's

responsibility to weigh the evidence and make a choice in

circumstances like this where the same evidence supports two

different yet reasonable conclusions.

The district court erred by failing to give the jury

-40-

the opportunity to choose between these versions of the facts.

The court's "finding" that Sullivan's involvement in the public

ownership policy was minimal ignores evidence in the record. The

court's view that the NFL imposed the ownership policy on the AFL

owners, rendering their participation involuntary, is largely

unsupported by the record. Ultimately, however, these are

factual questions for the jury and none of the instructions

provided by the district court served to adequately instruct the

jury on this issue or send the issue to the jury. Therefore, the

district court erred in refusing to give the NFL's proffered

instruction on the "equal involvement" defense.

The error was prejudicial. By refusing to instruct the

jury on the equal involvement defense, the district court

deprived the NFL of a complete defense from Sullivan's lawsuit.

The NFL presented facts that could have led to a dismissal of the

case if they were believed by a properly instructed jury. While

the NFL could have highlighted, and in fact did highlight, some

of the facts concerning Sullivan's support of, and reliance upon,

the ownership policy in its closing argument before the jury,

this effort was limited to the argument that the NFL's policy was

"reasonable" for purposes of the rule of reason analysis. The

NFL did not, and could not, argue to the jury that it should rule

in favor of the NFL because Sullivan's participation in the

adoption and maintenance of the public ownership policy was

complete, voluntary and substantially equal. Without the

proffered instruction, the jury had no occasion to consider

-41-

whether Sullivan should be deprived of a damages remedy because

of his involvement in the policy he now challenges. As a result,

the district court's refusal to send the equal involvement

defense to the jury was prejudicial error requiring a new trial.

B. Failure to Request an Official Vote of the Owners

As discussed in Section II.C. above, in order to

establish that the policy actually caused injury to himself,

Sullivan must prove that the NFL effectively denied his request

to waive or amend its policy against public ownership. While

there is evidence that supports a finding that the NFL's policy

effectively blocked Sullivan from pursuing his public offering,

there is also sufficient evidence to support a contrary finding.

Sullivan's failure to request a vote from the owners after he

discovered that he was four votes shy of obtaining a waiver with

seven owners still undecided, combined with former Commissioner

Rozelle's testimony that he told Sullivan that Rozelle would put

to the owners any plan that Sullivan wished, could support a

finding that Sullivan was a "dormant plaintiff" who did not

"spring into action" until it was "time to file suit." Out

Front, 748 F.2d at 170. As such, a jury could conclude that the

NFL did not prevent Sullivan from pursuing his stock sale, but

instead, Sullivan simply dropped the idea for reasons unrelated

to the NFL's policy. If the jury had reached such a conclusion,

Sullivan would have failed to prove that his injury was caused by

the antitrust policy, and judgment for the NFL would be required.

The NFL proposed instructions concerning Sullivan's

-42-

failure to ask for a vote essentially stating that such a failure

would result in judgment for the NFL if it was reasonable to

require Sullivan to make such a request. The court refused to

give the instruction because it felt that to do so would be to

comment on the evidence, and the court did not want to comment on

any of the evidence presented at trial. We understand the

court's concern but believe that, under the facts of this case,

there is a crucial point of law contained in the NFL's

instruction that was not otherwise provided to the jury.

The jury was instructed generally on the issue of

causation, but it was not told that it had to determine whether

the NFL's policy against public ownership was actually enforced

against Sullivan; that is, whether the policy, the alleged

antitrust restraint, actually restrained Sullivan in any way from

making a 49% public offering of his team. Although the NFL

could, and did, argue that Sullivan's failure to ask for a vote

was evidence that the policy did not cause injury to Sullivan,

there was no legal hook upon which the jury could hang the NFL's

argument. The failure of Sullivan to request a vote is a

critical and potentially dispositive issue in this case. If the

alleged restraint of trade does not even exist in practice, the

whole case essentially disappears. Therefore, the jury should

have been directed to make a specific finding as to whether the

public ownership policy was enforced against Sullivan.

If the jury is instructed that Sullivan must prove that

the NFL's policy was enforced against him, the jury will have

-43-

cause to consider the crucial matter of whether the NFL actually

enforced its policy against Sullivan or rather, whether the NFL

never had the chance to enforce its policy because Sullivan was

never prepared to pursue his public offering. The instructions

as proffered by the NFL may need to be tailored to avoid

commenting on the evidence surrounding the "missing" vote by the

NFL owners, but that does not excuse the court from giving no

instruction at all on the issue. The failure to give some

instruction concerning the failure of Sullivan to request a vote

was error.

C. The Murray Option

In 1986, prior to Sullivan's decision to sell Patriots

stock to the public, Sullivan sold Fran Murray an option to buy

the entire club. The NFL took the position that the Murray

option would have been an absolute bar to any public sale of

Patriots stock and that Sullivan therefore could not prove

causation. The NFL's position was supported by evidence

introduced at trial. Sullivan proffered evidence that the option

was not a bar to sale because the option could be bought out and

because it could not be legally enforced. The issue of whether

Murray could have, or would have, blocked a public offering by

the Patriots was ultimately disputed.

The option agreement and Murray's deposition testimony

were received into evidence. The district court, however,

refused to admit Murray's statement that he would indeed have

stopped any public stock sale of the Patriots from going forward

-44-

if he had been told about it. The court found the testimony to

be too speculative to be admissible. While the court's decision

to exclude Murray's "speculative" testimony is well within the

court's wide latitude of discretion in making such evidentiary

rulings, United States v. Abel, 469 U.S. 45, 54 (1984); Doty v.

Sewall, 908 F.2d 1053, 1058 (1st Cir. 1990), we note that

Sullivan's entire case as to the causation of injury was equally

speculative. Whether Sullivan's proposed stock sale could have

proceeded and would have been successful in the absence of the

NFL's public ownership policy was a matter of considerable

conjecture. Fairness would seem to militate towards allowing the

NFL to present its own version of the probable course of future

events to counter Sullivans' theorizing.

In any event, the court's subsequent refusal to give

the NFL's proffered jury instruction on the law of options,

specifically the legal consequences of options under

Massachusetts law, erroneously removed another crucial issue from

the jury's purview. The Murray option was a key defense for the

NFL, because if Sullivan did not have a legal right to sell

Patriots stock to the public, he did not suffer any harm from the

NFL's ownership policy and the NFL would have been entitled to

judgment in its favor. Again, the NFL could make this argument

to the jury, but the jury would still lack crucial information

concerning the legal underpinnings of a crucial defense for the

NFL.

Sullivan argues that the NFL's proposed instruction

-45-

would have singled out one factual issue related to causation for

the jury's special attention, something that would have unfairly

prejudiced Sullivan. Sullivan adds that allowing the instruction

would have generated countering instructions on other legal

facets of option law that were relevant to Sullivan's position on

the option issue and ultimately would have confused the jury.

These arguments notwithstanding, we feel that, as long as

suitable instructions are provided covering the basic legal

points relevant to each party's arguments, the jury would not be

unduly confused. Furthermore, the risk of prejudice from the

instruction -- due to the added attention afforded one of the

NFL's defenses -- is not sufficient to justify effectively

depriving the NFL of a crucial defense. Ultimately, it was for

the jury to decide whether the Murray option constituted an

insurmountable obstacle to Sullivan's case on causation, and the

district court's refusal to instruct on the law of options

virtually removed this issue from consideration by the jury.

D. Balancing Procompetitive and Anticompetitive Effects
in the Relevant Market

As we noted above, the rule of reason analysis requires

a weighing of the injury and the benefits to competition

attributable to a practice that allegedly violates the antitrust

laws. Monahan's Marine, 866 F.2d at 526. The district court

instructed the jury on its verdict form to balance the injury to

competition in the relevant market with the benefits to

competition in that same relevant market. The NFL protested,

claiming that all procompetitive effects of its policy, even

-46-

those in a market different from that in which the alleged

restraint operated, should be considered. The NFL's case was

premised on the claim that its policy against public ownership

was an important part of the effective functioning of the league

as a joint venture. Although it was not readily apparent that

this beneficial effect applied to the market for ownership

interests in NFL teams, the relevant market found by the jury,

the NFL argued that its justification should necessarily be

weighed by the jury under the rule of reason analysis. Sullivan

responded, and the district court agreed, that a jury cannot be

asked to compare what are essentially apples and oranges, and

that it is impossible to conduct a balancing of alleged

anticompetitive and procompetitive effects of a challenged

practice in every definable market.

The issue of defining the proper scope of a rule of

reason analysis is a deceptive body of water, containing

unforeseen currents and turbulence lying just below the surface

of an otherwise calm and peaceful ocean. The waters are muddied

by the Supreme Court's decision in NCAA -- one of the more

extensive examples of the Court performing a rule of reason

analysis -- where the Court considered the value of certain

procompetitive effects that existed outside of the relevant

market in which the restraint operated. NCAA, 468 U.S. at 115-20

(considering the NCAA's interest in protecting live attendance at

untelevised games and the NCAA's "legitimate and important"

interest in maintaining competitive balance between amateur

-47-

athletic teams as a justification for a restraint that operated

in a completely different market, the market for the telecasting

of collegiate football games).9 Other courts have demonstrated

similar confusion. See, e.g., L.A. Coliseum, 726 F.2d at 1381,

1392, 1397, 1399 (stating that the "relevant market provides the

basis on which to balance competitive harms and benefits of the

restraint at issue" but then considering a wide variety of

alleged benefits, and then directing the finder of fact to

"balance the gain to interbrand competition against the loss of

intrabrand competition", where the two types of competition

operated in different markets).

To our knowledge, no authority has squarely addressed

this issue. On the one hand, several courts have expressed

concern over the use of wide ranging interests to justify an

otherwise anticompetitive practice, and others have found

particular justifications to be incomparable and not in

correlation with the alleged restraint of trade. Smith v. Pro

Football, Inc., 593 F.2d 1173, 1186 (D.C. Cir. 1978); Brown v.

Pro Football, Inc., 812 F. Supp. 237, 238 (D.D.C. 1992); Chicago

Pro. Sports Ltd. Partnership v. National Basketball Ass'n, 754 F.

9 The Supreme Court did not expressly consider the issue
presented here. Therefore, it is impossible to tell whether the
Court was consciously applying the rule of reason to include a
broad area of procompetitive benefits in a variety of markets, or
whether the Court was simply not being very careful and
inadvertently extended the rule of reason past its proper scope.
There is certainly no language, as Sullivan suggests, indicating
that the Court was considering the alleged benefit of
"competitive balance" only to the extent that it had
procompetitive effects in the market for televised football
games.

-48-

Supp. 1336, 1358 (N.D.Ill. 1991). We agree that the ultimate

question under the rule of reason is whether a challenged

practice promotes or suppresses competition. Thus, it seems

improper to validate a practice that is decidedly in restraint of

trade simply because the practice produces some unrelated

benefits to competition in another market.

On the other hand, several courts, including this

Circuit, have found it appropriate in some cases to balance the

anticompetitive effects on competition in one market with certain

procompetitive benefits in other markets. See, e.g., NCAA, 468

U.S. at 115-20; Grappone, Inc. v. Subaru of New England, Inc.,

858 F.2d 792, 799 (1st Cir. 1988); M & H Tire Co. v. Hoosier

Racing Tire Corp., 733 F.2d 973, 986 (1st Cir. 1984); L.A.

Coliseum, 726 F.2d at 1381, 1392, 1397, 1399. Moreover, the

district court's argument that it would be impossible to compare

the procompetitive effects of the NFL's policy in the interbrand

market of competition between the NFL and other forms of

entertainment, with the anticompetitive effects of the intrabrand

market of competition between NFL teams for the sale of their

ownership interests, is arguably refuted by the Supreme Court's

holding in Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S.

36 (1977). Continental T.V. explicitly recognized that positive

effects on interbrand competition can justify anticompetitive

effects on intrabrand competition. Id. at 51-59. Although

Continental T.V. can reasonably be interpreted as referring only

to interbrand and intrabrand components of the same relevant

-49-

market, Hornsby Oil Co., Inc. v. Champion Spark Plug Co., 714

F.2d 1384, 1394 (5th Cir. 1983), there is also some indication

that interbrand and intrabrand competition necessarily refer to

distinct, yet related, markets. Continental T.V., 433 U.S. at 52

n.19 ("The degree of intrabrand competition is wholly independent

of the level of interbrand competition."). Arguably, the market

put forward by the NFL -- that is the market for NFL football in

competition with other forms of entertainment -- is closely

related to the relevant market found by the jury such that the

procompetitive benefits in one can be compared to the

anticompetitive harms in the other. Clearly this question can

only be answered upon a much more in-depth inquiry that we need

not, nor find it appropriate to, embark upon at this time.

Finally, we note that although balancing harms and

benefits in different markets may be unwieldy and confusing, such

is the case with a number of balancing tests that a court or jury

is expected to apply all the time. Indeed, Justice Brandeis'

famous formulation of the rule of reason seems to contemplate the

balancing of a wide variety of factors and considerations, many

of which are not necessarily comparable or correlative:

The true test of legality is whether the
restraint imposed is such as merely
regulates and perhaps thereby promotes
competition or whether it is such as may
suppress or even destroy competition. To
determine that question the court must
ordinarily consider the facts peculiar to
the business to which the restraint is
applied; its condition before and after
the restraint was imposed; the nature of
the restraint and its effect, actual or
probable. The history of the restraint,

-50-

the evil believed to exist, the reason
for adopting the particular remedy, the
purpose or end sought to be attained, are
all relevant facts.

Board of Trade of the City of Chicago v. United States, 246 U.S.

231, 238 (1918).

Although the issue of the proper scope of the rule of

reason analysis is more appropriately resolved in a case where it

is dispositive and more fully briefed, we can draw at least one

general conclusion from the caselaw at this point: courts should

generally give a measure of latitude to antitrust defendants in

their efforts to explain the procompetitive justifications for

their policies and practices; however, courts should also

maintain some vigilance by excluding justifications that are so

unrelated to the challenged practice that they amount to a

collateral attempt to salvage a practice that is decidedly in

restraint of trade.

In any event, we need not enter these dangerous waters

to resolve the instant dispute. The NFL wanted the jury to

consider its proffered justifications for the public ownership

policy -- namely that the policy enhanced the NFL's ability to

effectively produce and present a popular entertainment product

unimpaired by the conflicting interests that public ownership

would cause. These procompetitive justifications should have

been considered by the jury, even under Sullivan's theory of the

proper scope of the rule of reason analysis. As we point out in

note [4] above, and as Sullivan himself points out, to the extent

the NFL's policy strengthens and improves the league, resulting

-51-

in increased competition in the market for ownership interests in

NFL clubs through, for example, more valuable teams, the jury may

consider the NFL's justifications as relevant factors in its rule

of reason analysis. The danger of the proffered instructions on

the verdict form is that they may have mislead the jury into

thinking that it was precluded from considering the NFL's

justifications for its ownership policy. Therefore, the relevant

market language on the verdict form should be removed, or else

the jury should be informed that evidence of benefits to

competition in the relevant market can include evidence of

benefits flowing indirectly from the public ownership policy that

ultimately have a beneficial impact on competition in the

relevant market itself.

E. References to Prior Antitrust Cases Against the NFL

Despite a pretrial motion in limine and repeated

objections by the NFL, the district court allowed the jury to

hear numerous references to prior antitrust cases against the

NFL. Evidence about prior antitrust violations by the defendant

may, in appropriate cases, be admissible to show things like

market power, intent to monopolize, motive, or method of

conspiracy. United States Football League v. National Football

League, 842 F.2d 1335, 1371 (2d Cir. 1988) (hereinafter "USFL").

Because of the inherently prejudicial nature of such evidence,

however, evidence of prior antitrust cases involving the NFL are

only admissible if Sullivan can demonstrate that the conduct

underlying those prior judgments had a direct, logical

-52-

relationship to the conduct at issue in the present case. USFL,

842 F.2d at 1371; International Shoe Mach. Corp. v. United Shoe

Mach. Corp., 315 F.2d 449, 454 (1st Cir.), cert. denied, 375 U.S.

820 (1963) (plaintiff must show "that his claimed injury stemmed

directly and proximately from the same type of practice condemned

in the prior Government action"); see also Coleman Motor Co. v.

Chrysler Corp., 525 F.2d 1338, 1351 (3d Cir. 1975). In many of

the instances where Sullivan or his counsel made references to

prior antitrust cases at trial, Sullivan failed to satisfy this

burden.

Sullivan argues that the prior cases were relevant

either to certain testimony regarding the reasonableness of the

NFL's ownership policy and voting requirements or to the issue of

defining the relevant market. Because none of the cases

mentioned at trial concerned the NFL's ownership policy at issue

here, evidence of those prior cases is not relevant to the

reasonableness of the NFL's policy against public ownership. The

general voting requirements are not in dispute, so cases touching

solely upon them are also not relevant. Certain limited portions

of some prior antitrust decisions are relevant to the issue of

defining the relevant market. The testimony and commentary at

trial concerning these prior cases, however, was not limited to

the relevant market portions of these cases and, on the contrary,

focussed primarily on the issue of whether the NFL's public

ownership policy was unreasonable. As such, that evidence was

prejudicial, without any balancing relevance to justify its

-53-

admission into evidence.

The references to prior NFL cases were made in a number

of different contexts during the trial (including during direct

examination, cross-examination, and at closing argument), and

they contained a variety of different information. These

references are not likely to be repeated in precisely the same

context upon a new trial. Therefore, instead of identifying

which particular pieces of evidence were inadmissible, we think

it would be more useful to point out more generally that

references to prior NFL cases are not relevant to the issue of

the reasonableness of the NFL's public ownership policy and such

references should be excluded if they contain information about

the unreasonableness of other policies of the NFL which were at

issue in the other cases.

Reversed and remanded.

-54-